**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 745 CAP |
| | : | |
| Appellee | : | Appeal from the Judgment of |
| | : | Sentence entered on April 27, 2017 in |
| | : | the Court of Common Pleas, Pike |
| v. | : | County, Criminal Division at No. CP- |
| | : | 52-CR-0000019-2015 |
| | : | |
| ERIC MATTHEW FREIN, | : | ARGUED:  May 17, 2018 |
| | : | |
| Appellant | : | |

**OPINION**

**JUSTICE TODD**                                                    **DECIDED:  April 26, 2019**

Eric Matthew Frein appeals the judgment of sentence of death imposed by the Pike County Court of Common Pleas following his convictions by a jury of first-degree murder,[1] first-degree criminal homicide of a law enforcement officer,[2] criminal attempt to commit first-degree murder and criminal homicide of a law enforcement officer,[3] assault of a law enforcement officer in the first degree,[4] terrorism,[5] weapons of mass destruction,[6] discharge of a firearm into an occupied structure,[7] possessing instruments of crime,[8] and

---

[1] 18 Pa.C.S. § 2502(a).
[2] *Id.* § 2507(a).
[3] *Id.* § 901(a).
[4] *Id.* § 2702.1(a).
[5] *Id.* § 2717.
[6] *Id.* § 2716(a).
[7] *Id.* § 2707.1(a).
[8] *Id.* § 907(a).

recklessly endangering another person.[9]   For the reasons that follow, we affirm Appellant's judgment of sentence.

At approximately 10:45 p.m. on Friday, September 12, 2014, shortly before completing his 3:00 p.m. to 11:00 p.m. shift, Pennsylvania State Police Corporal Bryon K. Dickson, II entered the Blooming Grove police barracks in Pike County through the public lobby and went into his office.  After several minutes, he left his office and entered the communications room located near the front of the barracks and wished Nicole Palmer, a police communications operator who was just beginning her shift, a good night.  Corporal Dickson then exited the communications room and walked through the lobby on his way out of the barracks.  Palmer, who had answered a telephone call, heard a gunshot and looked out the communications room window, where she observed Corporal Dickson lying motionless on the concrete just outside the lobby doors.  Palmer immediately entered the lobby, at which time she heard another gunshot.  She opened the lobby doors and asked Corporal Dickson what had happened, and he mouthed the words "help me." N.T. Trial, 4/4/17, at 119.  Palmer retreated into the lobby and attempted to call 911.  She opened the lobby doors and again asked Corporal Dickson what had happened, and he stated, "I've been shot.  Drag me inside." *Id.* at 121.  Palmer then saw Police Communications Operator Christine Donahue in the communications room and instructed her to call 911.

Around that same time, Trooper Alex Douglass, who was scheduled to work the 11:00 p.m. to 7:00 a.m. shift beginning that night, arrived at the Blooming Grove police barracks in a marked police vehicle along with three other state troopers.  While the other troopers entered the barracks, Trooper Douglass took a gym bag to his personal vehicle in the parking lot.  As he placed the bag in his car, he heard a loud noise.  He looked

---

[9] *Id.* § 2705.

towards the front of the barracks and observed Corporal Dickson lying on the ground. He drew his weapon and approached Corporal Dickson. As Trooper Douglass reached Trooper Dickson, Trooper Douglass was shot in the hip. Trooper Douglass successfully pushed his way into the barracks, where he attempted to crawl out of view. Eventually, two other troopers dragged Trooper Douglass from the lobby to the interior of the barracks. Trooper Douglass subsequently was transported to a nearby school, where a helicopter was waiting to take him to the hospital; he survived.[10]

In order to reach Corporal Dickson, other officers who were present in the barracks drove a patrol vehicle from the back of the barracks to the front. Utilizing ballistic shields, officers were able to drag Corporal Dickson into the barracks, where they began CPR and attempted to use an AED. Upon their arrival, EMS workers attended to Corporal Dickson for a short time, but their efforts were unsuccessful and he was pronounced dead. The autopsy of Corporal Dickson indicated that he suffered two gunshot wounds, one in his upper right chest, and a second in his shoulder. Each of the wounds was fatal.

With the identity and the whereabouts of the shooter still unknown, members of the Forensic Services Unit ("FSU") of the Pennsylvania State Police arrived at the Blooming Grove police barracks at approximately 2:00 a.m. on Saturday, September 13, 2014 to process the crime scene. They recovered, *inter alia*, three projectiles from the front of the barracks, including the two bullets that killed Corporal Dickson and the one that severely injured Trooper Douglass. In a wooded area across the street from the police barracks, the FSU recovered four empty .308 caliber rifle casings with the head

---

[10] As a result of his injuries, Trooper Douglass underwent numerous surgeries. He testified at trial that he undergoes physical and aqua-therapy for 3½ hours a day, four days each week; he can no longer run; he experiences a tingling and/or burning sensation whenever he goes to the bathroom, as well as nausea-inducing pain; he treats with seven different doctors; and there is a possibility that he may need to have his lower leg amputated. N.T. Trial, 4/20/17, at 131-33.

stamp "AFF 88."[11]  In this same wooded area, the FSU observed one tree that appeared to have been hit by a bullet, and another tree in which a bullet was lodged.  Using a laser, the FSU determined that the projectiles found at the barracks and removed from the tree were fired from the area in the woods where the casings were found.  N.T. Trial, 4/5/17, at 175-78.

On Sunday, September 14, 2014, a man walking his dog in the area discovered a green Jeep Cherokee Sport vehicle stuck in a retaining pond off Route 402, approximately 2 to 3 miles from the Blooming Grove police barracks.  When he looked inside the Jeep, he observed an open gun case and various military supplies, and he notified the state police.   During a search of the vehicle, the police recovered the following items: a registration card identifying the owners as E. Michael and Deborah L. Frein, Appellant's father and mother; an invoice and receipt for classes at Northampton County Community College with Appellant's name and home address; an expired Pennsylvania driver's license issued to Appellant; a tube of camouflage paint; a pack of Drina brand cigarettes; a small "mini mag" flashlight; a brown paper bag containing 5 packs of cigarettes; an empty water bottle; two cigarette butts, one of which later was determined to contain Appellant's DNA; and a wallet with a chain attached to a key ring.  The wallet contained, *inter alia*, a current Pennsylvania driver's license issued to Appellant; Northampton Community College and East Stroudsburg University photo I.D. cards issued to Appellant; and a credit card and social security card with Appellant's name.  On the floor in the back of the vehicle where the vehicle jack is located, police discovered two empty rifle casings with the head stamp "AFF 88."   Police also recovered from the vehicle a faded black hooded sweatshirt; a shooting range permit issued to Appellant; a black rifle case; and a

---

[11] "AFF" stands for Ammunition Factory Footscray, Footscray being a suburb of Melbourne, Australia, and "88" referring to the year in which the ammunition was produced, i.e., 1988.  N.T. Trial, 4/13/17, at 136.

green military satchel with handwriting on the outside. Additionally, a search of the area around the retaining pond revealed an AK-47 rifle, which contained a magazine with 27 live rounds and one round in the chamber, partially hidden under a pile of leaves, in close proximity to a camouflage backpack. On top of the backpack were two magazines of ammunition.

On September 15, 2014, police conducted a search of the residence in which Appellant lived with his parents. In the garage, police discovered in a workbench drawer expended rounds of ammunition with the head stamp AFF 88. From Appellant's second floor bedroom, police recovered, *inter alia*, a variety of guns; magazines of ammunition; ammunition boxes; binoculars; a radio; a box and receipt for night vision goggles; a book titled Sniper Training and Employment; an IBM Think Pad; a pack of Drina brand cigarettes; a plastic bag containing lead piping and caps, materials used in making bombs; a yellow notepad with a handwritten list of survival supplies and types of ammunition; and a handwritten list of "Things to Do."[12] A massive manhunt for Appellant ensued.

On September 29, 2014, FBI Special Agent Matthew Fontaine, who was assisting in the search for Appellant, was advised there had been a cell phone "ping" in an area near Canadensis, Pennsylvania, that had not yet been cleared by members of the FBI Swat Team. Agent Fontaine ultimately discovered a campsite where there were various items covered in camouflage, including: clothing; a checkbook with Appellant's name; size 13 hiking boots (Appellant's size); .308 caliber ammunition stamped "AFF 88"; and two improvised explosive devices ("IEDs").[13] Near the campsite, in an area described as

---

[12] The "Things to Do" list included, *inter alia*, the following tasks: "Clean Jeep; Inspect Cache; Repack, Re-assess equipment; Clean guns; Re-sight, affirm zero; Re-assess outfit (Green); Clean Room." Commonwealth Exhibit 187. It also contained a list of additional survival items and weaponry.
[13] The IEDs were the basis for the charge of possessing instruments of mass destruction.

a bear cave, agents located a white trash bag containing, *inter alia*, empty water bottles. An agent removed one of the empty water bottles, labeled Nestle Pure Life, from the bag, but left the remainder of the bag intact in an effort to have the area appear undisturbed in case Appellant returned.

The following day, another agent returned to the same area and collected, *inter alia*, various food items; toiletries; clothing; camping gear; and a folding shovel. He also collected the aforementioned white trash bag, which contained three crumpled pages torn from a small spiral notebook. Those pages read as follows:[14]

> Made it to camp tues.
> Sept 16th
>
> Fri Sept 12th
> Got a shot around 11 pm and took it. He dropped and yelled. I was surprised at how quick I took a follow up shot on his head/neck area. He was still and quiet after. A lady was in the door way on her cell phone looking at him. Another cop approached the one I just shot. As he went to kneel I took a shot at him and jumped in the door. His legs were visible and still.
>
> _____
>
> I ran back to the jeep. lots of cops were driving up and down 402. No attention was given to the woods.
>
> I made maybe half a mile from the GL road and hit a road block. I didn't expect one so soon. It was only 15-20 min. I did a K turn ¼ mile from them and pulled into a development I knew had unfinished acess road. no one gave chase.
>
> _____
>
> Hearing helos I just used my marker lights missed the trail around a run off pool and drove strait into it. Disaster!
> Made half attemp to stash AK and ran. Spent all night tracking SW towards a stream that went under 84.

---

[14] We have quoted these handwritten notes, which are at times difficult to read and contain some grammatical and spelling errors, to the best of our ability and exactly as they appear in the record.

Commonwealth Exhibit Nos. 227-229.

Despite the involvement of the Pennsylvania, New York, New Jersey, Virginia, Maryland, and Connecticut State Police Departments, as well as local police departments, the FBI, the Bureau of Alcohol Tobacco and Firearms, Homeland Security, and the United States Marshals, Appellant remained at large until October 30, 2014, when a team of United States Marshals located him approximately 30 miles from his home, on abandoned resort property on which sat an old airplane hangar, and took him into custody. Shortly after being captured, Appellant asked one of the marshals, "Can I tell you where the guns are located inside the hangar?" N.T. Trial, 4/10/17, at 79. The marshal answered in the affirmative, and Appellant described the location of two rifles and one loaded pistol inside the hangar. Appellant also told the marshals that there was ammunition in the hangar. *Id.* at 84-85.

During a subsequent search of the airplane hangar, state police discovered the rifles, one of which was a Norinco semiautomatic rifle, and a pistol, as well as the following items: a scope; a notebook; a bayonet; a compass; camouflage mesh; a camouflage tarp; a radio receiver; pencils; a map of Route 402; notes; a miner's light; a brown sheet; green material; a gun cleaning kit; binoculars; a laptop computer; computer thumb drives; a solar panel power charging kit; maps; a magazine clip and bullets; ammunition; pipe; a flashlight; gloves; scissors; batteries; food; water; and toiletries. They also discovered several papers with handwritten sighting distances, calculations for different range settings based on distance, wind, bullet weight, and other conditions, and a hand-drawn map of the area of Route 402 in relation to the Blooming Grove barracks. Finally, the police recovered a small memo pad with a black cover allegedly detailing Appellant's activities following the shootings, which read as follows:

> Had to run. Jeep got stuck. ditched the Kalashnikov and went on foot.

-tracked SW to stream that looked to go under 84.

+ Sept 13 Sat  day 2

-Made the stream ~ Sun up.  Got $H_2O$, C1 worked.

-Rained all day and cold.

-Made bridge on Egypt Rd.  tried to wait for sundown but too cold.

-Got lost in development. kept moving S. crossed deep stream.

-took PL trail up to 84.

-too much activity to cross.

Could not find stream access.

+ Sept 14 Sun.  day 3

-Slept all day in abandoned camper.  Mattress and 2 blankets

-Crossed 84

-No activity so track to PL trail

-Got to high knob before too cold.  Made small fire to dry things.

+ Sept 15 Mon.  day 4

-tracked around high Knob.

-crossed Bushkill. camp fire again.

+ Sept 16 tues day 5

-stash was unmolested. Ate for first time in 3 days. Slept well.

+ Sept 17 Weds 6 days

-Moved deeper in.  Built shelter, got cleaned up.

+ Sept 18 thurs 7 days

-turned cell on for 10-15 sec. Rang home twice to let them know I'm still alive.  Got a text indicating I am suspect.

-Helos & planes around that evening.

+ Sept 19 Fri. 8

-Patrol went by > 100 m, was not spotted.  they seem stuck to trails.

+ 20 Sept Sat 9

-Found a news radio station finally.  They called me a survivalist… HA!  Catchy phrase I guess.

-200 police shelter in place for Pike and Barrett… shelter in place for protection from spooked cops.

+ Sept 21 Sun 10

-Shelter in place lifted.

-they found the kalashnikov.

+ Sept 22 Mon. 11

-Made it across Broadhead right under helos.  Went in over my head test water.  Could only move till 10ish before I had to stop and change out of wet clothes b/c it was 38°f.

+ Sept 23 tues 12

-Waited all day for clothes & boots to dry.

-First part went well. Second not so much, but I made it.
+ Sept 24 Weds 13
-Got a bath!
+Sept 25 thurs 14
-Slept like a human first time in 2 weeks
-Got buckets to catch rain.
-Spent hour listening to music on laptop.  Classical made me cry.  Mr. Prime (?) made me laugh both much needed.
-Police activity still in canadensis
+ Sept 26 Fri - 15
-Shaved & did laundry.
+ Sept 27 Sat. 16
-they searched Buckhill Inn.
-Some noisy kids came by at 5pm.  Were only in front room for few min then left.
+ Sept 28  Sun. 17
-Nothing
+ Sept 29 Mon 18
-Still 5 mile zone ~ Snowhill
-took a bath
-Gave rifle & pistol good cleaning
-No idea if scope is still zeroed after all this time.
+ 30 Sept tues 19
-Fasted all day except pipe tobacco & coffee.
-the found the stash.
-they think there are pipe bomb around…that is not the case but it should slow them down.
+ Oct 1 Weds 20
-1060 AM Phili claims there are 1000 searchers.
-A snooper came by ~ 3 pm just taking pictures in front part
-Helos close after dark.  traveling not searching.
+ Oct 2 thurs 21
-Hunting closed in Barrett & Pike.
-2 cops fell from tree stand.
-Had to flown to hospital.
That is what the helos last night must have been for.
-About to head out on recon. nervous.
+ Oct 4 Sat 23
-Heading back.  Heart broken. No respit. Recon went well but bad news… still too much activity.  this massive search cannot last forever.
-Made it back in good time
+ Oct 5 Sun 24
-Slept through morning
-found a spigot & a cozy place to plug in laptop.
+ Oct 6 Mon. 25

-Search in 1 mile zone of Mill creek. Recon passed through there, dog might have caught my scent.
-they are bugging Justin now.
+ Oct 7 tues 26
-Got a bath
-Going to try fasting today.
-Only lasted till 9 pm too cold had to eat something hot.
+ Oct 8 weds 27
-Did laundry
+ Oct 9 thurs. 28
-Found case of chocolate finally! Hid it too well.  Should add calories to my diet.
+ Oct 10 Fri 29
-No mention of me on morning news.  No news is good news I hope.
+ Oct 11 Sat. 30
-30 days.  A lot longer than I expected to last.
-lord Jesus Christ Son of God have mercy on me a sinner-
[Indecipherable sentences]
I have never been camping for more than 3 days
+ Oct 12 Sun 31
-Got a bath. & shaved
+ Oct 13 Mon 32  Columbus day I think
-No news
+ Oct 14 tues 33
-No news
-Weekend house who spigot I have been using must have shut it off for winter.  Now getting $H_2O$ will be far more risky… or I could place trust in rain water.
+ Oct 15 Weds 34
-trick or treating and halloween parade cancelled in Barrett. It is surprising what the people are letting them get away with.
+ Oct 16 thurs 35
-A state senator is coming to review the investigating and manhunt.  They are probably struggling to show examples of progress with so much tax payer $ spent.
+ Oct 17 Fri 36
-Got a bath & did laundry.
+ Oct 18 Sat 37
-Got on the internet. No luck yet contacting help.  Read some articles, most of it bullshit. Cops seem to be chasing bears that house wives think are me.
-there is a coyote around here, or might be a coy-dog.  I only see him out night.
He calls out most nights ~ 11 pm.

+ Oct 19 Sun 38
-Gonna try to get food tomorrow night… Good chance I'll get caught doing so.
+ Oct 20 Mon. 39
Going for food tonight.  I only have beans left.  Shop lifting is probably less risky than breaking in some place.  Wish I had stashed a pair of jeans.  I could keep waiting to contact help, but there is little guarantee there.
-Its suppose to rain tonight into Fri.  Found a case of canned hot chocolate with that & the beans I should hold till Fri.
Cops are searching around Swiftwater anyway.
+ 21 Oct Tues 40
-Another false sighting near Swiftwater
+ 22 Oct Weds 41
-Nothing
+ 23 Oct thurs 42
-Nothing
+ 24 Oct. Fri. 43
-Nothing
+ 25 Oct Sat. 44
-Found 2 packages of crackers
now I have something to add to the beans again
+ 26 Oct Sun 45
-OJ--- I broke into a place
was careful not to damage anything.
Just took some rice, ramen, oil & a bottle of Korean spirits.
lord have mercy, Christ have mercy.
+ Oct 27 Mon. 46
-Nothing.
+Oct 28 tues 47
-Nothing
+ Oct. 29 Weds 48
-took a 10 mile hike.  Very little was accomplished.  All wifi needs a code. And I don't have the tools to break into places without smashing glass.

Commonwealth Exhibits 328-344.

After being taken into custody on October 30th, Appellant was transported to the Blooming Grove police barracks, where he was placed in an interrogation room at approximately 8:23 p.m.  A medic was brought in to attend to a cut on Appellant's face. Shortly thereafter, Pennsylvania Police Corporal Benjamin Clark and Trooper Michael Mulvey entered the interrogation room.  Corporal Clark removed Appellant's handcuffs,

offered him coffee and cigarettes, and made small talk with Appellant before reading him his *Miranda*[15] rights at approximately 8:36 p.m. When Corporal Clark asked Appellant if he wanted to waive those rights, Appellant asked if he could read the written waiver form. After reading the waiver form, Appellant refused to sign it, and told the officers that he was not willing to answer questions; however, he told them he would tell them the location of a rifle he had buried on wooded game lands near Route 447 because he did not want any children to find it.[16] The officers questioned Appellant about the buried rifle, and then asked if there was anything else that might cause harm to law enforcement or citizens if it was discovered. Appellant repeatedly assured the officers there was not. As we discuss in more detail below, the officers then began to question Appellant about his activities over the last several weeks, about the publicity surrounding the crimes, and, most significantly, his motives for the crime. Although Appellant never offered any explanation for his actions, he made several statements during which he implicitly, if not expressly, admitted his guilt, including that he regretted his actions; that he acted alone; and that he didn't know why he did what he did. The entire interview, beginning from the time Appellant entered the interrogation room, lasted approximately four hours and was recorded on videotape.[17]

At approximately 8:48 p.m., while Appellant was in the process of being interviewed, Attorney James Swetz called the Blooming Grove barracks and advised the dispatcher that he had been retained by Appellant's family and that he was coming to the barracks to see Appellant. The dispatch provided Attorney Swetz with an alternate phone

---

[15] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[16] At trial, Corporal Clark testified that, despite the use of metal detectors and dogs, police were unable to locate a buried rifle in the area identified by Appellant. N.T. Trial, 4/11/17, at 26.

[17] The videotape is 4½ hours long, and includes the search of Appellant's person and the inventory of his clothing after the interview was completed. There is no written transcript of the interview.

number, and, upon calling that number, Attorney Swetz was told that he would not be permitted to enter the barracks to see Appellant because Appellant had not requested counsel. N.T. Suppression Hearing, 4/3/17, at 41. Despite this information, Attorney Swetz went to the barracks, but was denied entry. He made another call to the barracks, and, shortly thereafter, two plainclothes troopers came out of the barracks and advised Attorney Swetz that the District Attorney, Ray Tonkin, would get back to him. Attorney Swetz eventually left the police barracks without seeing Appellant. Attorney Swetz subsequently received a call from District Attorney Tonkin at 1:13 a.m. the following morning.[18] At approximately 1:30 a.m. on the morning of October 31, 2014, Trooper Sean Doran was called to the Blooming Grove police barracks to collect a DNA sample from Appellant pursuant to a warrant.

On January 29, 2015, Attorneys Michael Weinstein and William Ruzzo were appointed to represent Appellant. On February 16, 2016, counsel filed a motion to suppress the statements Appellant made during his interview with Corporal Clark and Trooper Mulvey on October 30, 2014, on the basis that they were obtained in violation of his right to remain silent under *Miranda*, and in violation of his right to counsel under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution. Following a hearing, the trial court denied the motion. A jury trial commenced on April 5, 2017. Among the various witnesses presented by the Commonwealth, Corporal Joseph M. Gober, a member of the Pennsylvania State Police Firearms and Toolmarks Unit at the Bureau of Forensic Services, testified that he examined the four empty shell casings found in the woods across from the Blooming Grove barracks, the bullets found inside the barracks, and the bullet recovered from the tree in the woods across from the barracks, and determined that they were fired from the

_____

[18] Neither the briefs, nor the trial transcripts, reveal the substance of this phone call.

Norinco rifle that was recovered from inside the airplane hangar. N.T. Trial, 4/13/17, at 158-81. Corporal Gober further testified that the empty shell casings stamped "AFF 88" which were recovered from Appellant's jeep also were discharged from the Norinco rifle. *Id.* at 180.

Lauren Force, an expert in DNA analysis, testified that she examined DNA evidence obtained from several items collected during the search for, and capture of, Appellant, including the Nestle Pure Life water bottle discovered in the trash bag near the campsite; a cigarette butt and the black hooded sweatshirt found in the Jeep; and the Norinco rifle and the ammunition magazine recovered from the airplane hangar. She determined that the major component of DNA samples obtained from the aforementioned items matched the DNA of Appellant. *Id.* at 96-100.

Corporal Mark Gardner, an expert in document examination, testified that he compared known handwriting samples of Appellant with the handwriting on the three crumpled notebook pages that were found inside the white trash bag discovered by police in the bear cave near the campsite on September 30, 2014. Corporal Garner stated that, based on his analysis, he "could come to no other conclusion than the authorship was the same and that [Appellant] did write these questioned papers." N.T. Trial, 4/13/17, at 27. Additionally, Julia Barker, an expert in the chemical analysis of documents, testified that the three notebook pages found in the trash bag were "chemically indistinguishable" from the pages of the small memo pad with the black cover found in the airplane hangar. *Id.* at 46.

The Commonwealth also presented the testimony of retired Pennsylvania State Police Corporal Derek Fozard, who examined the laptop computer recovered from the airplane hangar. Corporal Fozard testified that forensic analysis of the laptop computer, the registered owner of which was Appellant, revealed internet searches for police

departments in areas surrounding the state police barracks at Blooming Grove, conducted on September 9, 2014, three days before the shooting, N.T. Trial, 4/17/17, at 17, and internet searches concerning "officer down" calls that were conducted on September 12, 2014, prior to the time Corporal Dickson and Trooper Douglass were shot. *Id.* at 20-23. The forensic analysis also revealed internet searches for "Blooming Grove" on October 19, 2014; instructions on how to delete a Facebook page on October 27, 2014; and numerous searches for "Eric Frein" on October 28 and 29, 2014. *Id.* at 24. There was also evidence of an internet search for the name "Bryon Dickson" on October 29, 2014, as well as searches for "wanted poster Eric Frein" and "Eric Frein support" on the same day. *Id.* at 26-27. Finally, Corporal Fozard testified that, on September 12, 2014, there was a search of coordinates which corresponded to the location of the Blooming Grove barracks, and he found a document file dated October 6, 2014 that contained a letter written by Appellant to his parents.[19] *Id.* at 32-34, 61-62, 77.

In addition to the above evidence, the entire post-arrest videotaped interview of Appellant by police was played for the jury and entered into evidence, over defense

---

[19] The letter read, in part:
Dear Mom and Dad,

Our nation is far from what it was and what it should be. I have seen so many depressing changes made in my time that I cannot image what it must be like for you. There is so much wrong and on so many levels only passing through the crucible of another revolution can get us back the liberties we once had. I do not pretend to know what that revolution will look like or even if it would be successful.

Tension is high at the moment and the time seems right for a spark to ignite a fire in the hearts of men. What I have done has not been done before and it felt like it was worth a try.

\* \* \*

I do not have a death wish but I know the odds. I tried my best to do this thing without getting identified, but if you are reading this then I was not successful. If I am still alive and free know that I will do my best to remain as such. And as time goes by, if circumstances change, if my spark hit good tinder, then I may be able to return one day.
Commonwealth Exhibit 505.

counsel's objection.  On April 19, 2017, Appellant was convicted of the aforementioned charges.

At the penalty phase of Appellant's trial, the Commonwealth presented, *inter alia*, the testimony of 10 victim impact witnesses, including Corporal Dickson's wife, sister, mother, and father, and Trooper Douglass; 32 photographs of Corporal Dickson and his family; a video of Corporal Dickson and his family; and a video of Corporal Dickson's graduation from the Pennsylvania State Police Academy.  The jury found several aggravating circumstances, including (1) the victim was a police officer killed in the performance of his duty, 42 Pa.C.S. § 9711(d)(1); (2) the offense was committed during the perpetration of other felonies, *id.* § 9711(d)(6); (3) Appellant knowingly created a grave risk of danger to other persons, *id.* § 9711(d)(7); and (4) Appellant "has been convicted of another Federal or State offense, committed either before or at the time of the offense at issue, for which a sentence of life imprisonment or death was imposable," *id.* § 9711(d)(10).  The jury found no mitigating circumstances, and returned a sentence of death.

In accordance with 42 Pa.C.S. § 9711(c)(1)(iv), which requires that a trial court impose a sentence of death where the jury finds aggravating, but no mitigating circumstances, on April 27, 2017, the trial court imposed, *inter alia*, two death sentences, one for first-degree murder, and one for first-degree murder of a law enforcement officer. Following the denial of his post-sentence motion, Appellant filed a notice of appeal, and the matter is now before this Court.

## I. Sufficiency of the Evidence

Although Appellant has not raised a claim regarding the sufficiency of the evidence, in all capital direct appeals, this Court reviews the evidence to ensure that it is

sufficient to support a first-degree murder conviction. *Commonwealth v. Poplawski*, 130 A.3d 697, 709 (Pa. 2015).

First-degree murder is an intentional killing, *i.e.,* a "willful, deliberate and premeditated killing." 18 Pa.C.S. § 2502(a), (d). In order to prove first-degree murder, the Commonwealth must establish that: (1) a human being was killed; (2) the accused caused the death; and (3) the accused acted with malice and the specific intent to kill. *Id.* The jury may infer the intent to kill based upon the defendant's use of a deadly weapon on a vital part of the victim's body. *Poplawski*, 130 A.3d at 709.

In reviewing whether the evidence was sufficient to support a first-degree murder conviction, we must evaluate the entire trial record and consider all of the evidence. *Id.* Further, we must bear in mind that the Commonwealth may sustain its burden by means of wholly circumstantial evidence, and "the trier of fact, while passing upon the credibility of witnesses and the weight of the evidence, is free to believe all, part, or none of the evidence." *Id.* (citation omitted). Finally, the evidence must be viewed in the light most favorable to Commonwealth as the verdict winner. *Id.* at 710.

As detailed above, the Commonwealth presented at trial expert testimony that the bullets that fatally wounded Corporal Dickson were fired from a Norinco rifle which belonged to Appellant, and which was later recovered from the airplane hangar where Appellant had been hiding following the shooting; indeed, upon his capture, Appellant directed police to the location of the rifle. The expert testimony also established that Appellant's DNA was on the Norinco rifle. The Commonwealth further introduced evidence that Appellant had conducted internet searches for possible targets, including the Blooming Grove police barracks, and response procedures for when officers are shot, in the days leading up to the shootings of Corporal Dickson and Trooper Douglass. Finally, the Commonwealth presented three notebook pages written by Appellant

describing the shooting of Corporal Dickson, as well as a notepad detailing Appellant's six-week effort to avoid capture. In the case *sub judice*, the evidence presented by the Commonwealth, and the reasonable inferences deduced therefrom, clearly demonstrate that Appellant, acting with malice and the specific intent to kill, caused the death of Corporal Dickson, thus supporting the jury's verdict of first-degree murder.

In conjunction with the undisputed evidence that Corporal Dickson was a Pennsylvania State Police Officer, this same evidence also supports the jury's verdict of first-degree criminal homicide of a law enforcement officer.

## II. Denial of Appellant's Motion to Suppress

In his first briefed issues, Appellant challenges the trial court's denial of his motion to suppress the statements made during his post-arrest videotaped interview with police on two separate grounds − a violation of his right to remain silent and a violation of his right to counsel. When reviewing the denial of a suppression motion, this Court reviews only the suppression hearing record, and not the evidence elicited at trial. *In the Interest of L.J.*, 79 A.3d 1073, 1085 (Pa. 2013). Where the record supports the suppression court's factual findings, we are bound by those findings and may reverse only if the court's legal conclusions are erroneous. *Poplawski*, 130 A.3d at 711.

To protect an individual's Fifth Amendment[20] privilege against self-incrimination, the United States Supreme Court has held that, before an individual in police custody may be interrogated, he must first be informed, in clear and unequivocal terms, that he has the right to remain silent, that anything he says can and will be used against him in court, and that he has the right to consult with counsel and to have counsel present during interrogation, and, if he is indigent, counsel will be appointed for him. *Miranda,* 384 U.S. at 467–69. If an individual "indicates in any manner, at any time prior to or during

---

[20] The Fifth Amendment provides, in relevant part: "No person shall . . . be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.

questioning, that he wishes to remain silent, the interrogation must cease," and any statement taken after the person invokes his privilege "cannot be other than the product of compulsion, subtle or otherwise." *Id.* at 473-74. Further, "if the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning." *Id.* at 474. If the individual is unable to obtain an attorney, but indicates that he wants one before speaking to police, the police must respect the individual's decision to remain silent. *Id.*

In *Michigan v. Mosley*, 423 U.S. 96 (1975), the high Court explained that it is "[t]hrough the exercise of his option to terminate questioning" that an accused "can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting." *Id.* at 103-04. Accordingly, the Court held that "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Id.* at 104.

In *Davis v. United States*, 512 U.S. 452 (1994), the United States Supreme Court explained that, when invoking a right to counsel under *Miranda*, a suspect must do so unambiguously. *Id.* at 459. If a suspect makes a statement regarding the right to counsel that is ambiguous or equivocal, the police are not required to end the interrogation, nor are they required to ask questions designed to clarify whether the suspect is invoking his *Miranda* rights. *Id.* at 461-62. In *Davis*, the Court concluded that the suspect's statement, "Maybe I should talk to a lawyer," was not a request for counsel, and, therefore, law enforcement agents were not required to cease questioning. *Id.* at 462.

Subsequently, in *Berghuis v. Thompkins*, 560 U.S. 370 (2010), the Supreme Court held that "there is no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel at issue in *Davis*," as both protect the privilege against compulsory self-incrimination by requiring an interrogation to cease when either right is invoked. *Id.* at 381. In *Berghuis*, the suspect sat silent for the first two hours and 45 minutes of a 3-hour interrogation before he answered "yes" to a police officer's question as to whether the suspect prayed for God to forgive him for the shooting. The high Court held that, because the suspect did not state that he wanted to remain silent or that he did not want to talk with the police, he did not unambiguously invoke his right to remain silent. *Id.* at 382.

Of course, an accused may waive his *Miranda* rights. In *Edwards v. Arizona*, the high Court recognized that, "after initially being advised of his *Miranda* rights, the accused may himself validly waive his rights and respond to interrogation." 451 U.S. 477, 484 (1981) (citing, *inter alia*, *North Carolina v. Butler*, 441 U.S. 369, 372-76 (1979)). The Court cautioned, however, that "waivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case 'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" *Edwards*, 451 U.S. at 482.

The *Edwards* Court further reiterated:

> [this] Court has strongly indicated that additional safeguards are necessary when the accused asks for counsel; and we now hold that when an accused has invoked his right to have counsel present during custodial interrogation, *a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation* even if he has been advised of his rights. We further hold that an accused . . . having expressed his desire to deal with the police only through counsel, is not subject to further

> interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

*Id.* at 484-85 (emphasis added, footnote omitted); *see also Commonwealth v. Keaton,* 45 A.3d 1050, 1067 (Pa. 2012) (invocation of Fifth Amendment right to counsel shields arrestee from further interrogation until counsel is present, unless arrestee initiates further conversation with police). This same standard applies to an accused's invocation of the right to remain silent. *See Berghuis, supra.*

With this background in mind, we address Appellant's claim that Corporal Clark and Trooper Mulvey failed to "scrupulously honor" his right to remain silent. Appellant's Brief at 18. Appellant emphasizes that, after being read his *Miranda* rights, and requesting permission to read the *Miranda* waiver form himself, he refused to sign the form waiving his rights. Appellant then told the officers that he did not wish to talk about any crimes, but that he would tell him where a rifle was buried in the woods, a statement that Corporal Clark acknowledged and repeated back to Appellant. Appellant contends that, once he invoked his right to remain silent, the officers were required to cease questioning him about matters beyond the location of the rifle in the woods, and that the additional questioning by the officers, which was designed to elicit information which Appellant had already indicated he did not wish to disclose, resulted in answers obtained by compulsion.

In response, the Commonwealth contends that the "facts here demonstrate Appellant did not assert his desire to refrain from speaking to the police. As such [Appellant] did not unambiguously assert his right to silence and chose to speak with police." Commonwealth's Brief at 33. The Commonwealth further argues that, "[e]ven if [Appellant] did initially invoke his right to silence on the criminal events he committed, it was [Appellant] who initiated conversation about Corporal Bryon Dickson, and thus the statements are admissible." *Id.* at 34.

Following our careful review of Appellant's post-arrest videotaped interview,[21] we have little difficulty in concluding that Appellant unambiguously asserted his right to remain silent, and, in fact, did so multiple times. The videotape began running at 8:15 p.m. At 8:35 p.m., almost immediately after Appellant was brought into the interview room, Corporal Clark asked him if there was "anything dangerous out in the world." Videotaped Interview, at 19 minutes. Appellant indicated that there were items in the airplane hangar and that there was a rifle in a gun case that was buried in the woods, and that he would show them the location of the buried rifle on a map. Corporal Clark then read Appellant his *Miranda* rights, and asked Appellant whether he wished to waive those rights. Appellant asked if he could read the waiver form himself, and, after doing so, refused to sign it. Appellant also told Corporal Clark that he was "*not willing to answer questions*," but that he would tell them about the rifle buried in the woods. *Id.* at 22 minutes (emphasis added). Corporal Clark repeated Appellant's assertion: "You don't want to answer questions about any crime, but you're willing to tell us where a rifle is buried," and Appellant responded "Yes." *Id.*

After discussing the location of the rifle, Corporal Clark and Trooper Mulvey asked Appellant if he had seen any newspapers or heard news reports, telling him that he was a "national figure" and "famous." *Id.* at 33 minutes. Appellant then inquired where he would be going, and Corporal Clark explained that he would be taken to the Pike County jail. At approximately 8:50 p.m., Appellant asked the officers "You're both fathers, right?" When Corporal Clark and Trooper Mulvey responded affirmatively, Appellant commented, "There was a father that didn't come home." *Id.* at 35 minutes. The officers

---

[21] As noted above, the interview was not transcribed. In addition, the videotape contains a military time stamp at the top the frame, which is often difficult to read. Accordingly, when quoting a statement from the interview, we will refer to its location on the tape by referencing the elapsed time from the beginning of the tape, i.e., Videotaped Interview, at 20 minutes.

asked Appellant if he knew how many children Corporal Dickson had, and Appellant asked how old the children were. Corporal Clark then asked Appellant "Did you not think about [Dickson's children] beforehand?" and Appellant said something inaudible. *Id.* at 38 minutes. Corporal Clark asked Appellant, "What's that?" and Appellant made another statement that is mostly inaudible, but for the clear articulation of the word "lawyer." *Id.* Appellant then stated: "*I don't want to get too far into it. We're gonna be going at it in court at some point.*" *Id.* (emphasis added). Corporal Clark responded, "Well, yeah, it is what it is." *Id.* Corporal Clark then stated that he wants to know "what happened out there and why," and remarked that "nobody's threatening you . . . we're just having a conversation." *Id.* at 39 minutes. The officers told Appellant that he had the opportunity to "set [the record] straight," and encouraged him to not let the media "define" him. *Id.* Appellant then stated, "All I can say is I'm sorry." *Id.* at 40 minutes.

The conversation then turned to Appellant's political leanings, his parents, and his dog. The officers questioned Appellant as to how he had survived while he was on the run from police. The officers then asked if Appellant regretted his actions, and Appellant replied "yes." *Id.* at 1:04 minutes. As the officers pressed Appellant regarding his reasons for choosing the Blooming Grove barracks, Trooper Mulvey indicated that he was concerned for his own (Trooper Mulvey's) safety, and that is why it was so important for him to know the reasons behind Appellant's actions. Appellant was noncommittal, and tried to avoid answering, and then once again commented that he's going to be in court. *Id.* at 1:20 minutes. The officers responded that "It's your story to tell," and then told Appellant that his father was upset because Appellant's brother and half-sister had been questioned. *Id.* at 1:20-1:21 minutes. The officers continued to question Appellant, repeatedly asking him to confirm that he acted alone. Appellant repeatedly assured them that he did act alone, and then invoked his right not to speak to the officers without an

attorney present, by stating, "*I don't want to give you all too much information until I talk to a lawyer.*" *Id.* at 1:25 minutes (emphasis added). However, the officers continued to question Appellant, telling him that, if he talked about the crime, it would be a weight off of him and that he owed Corporal Dickson's family an explanation. *Id.* at 2:42 minutes.

In our view, Appellant's statement that he was not willing to answer questions, but would tell the officers where a rifle was buried in the woods constituted a clear and unambiguous invocation of his right to remain silent. Moreover, the fact that Corporal Clark repeated Appellant's statement back to him, stating "you don't want to answer questions about any crime, but you're willing to tell us where a rifle is buried," demonstrates that the officers clearly understood Appellant's statement as an invocation of his right to remain silent. Indeed, in *Commonwealth v. Lukach*, __ A.3d __, 2018 WL 5020353 (Pa. filed Oct. 17, 2018), this Court held, *inter alia*, that the suspect unambiguously invoked his right to remain silent when stating: "I don't know just, I'm done talking. I don't have nothing to talk about," and that the interrogating officer clearly understood that the suspect was invoking his right to remain silent, as evidenced by the officer's reply: "You don't have to say anything, I told you that you could stop." *Id.* at *10 (quoting transcript).

In suggesting, however, that the statements Appellant made during the videotaped interview were admissible at trial because, even if Appellant invoked his right to remain silent by initially stating he did not want to talk about any crimes, he subsequently initiated a conversation with the officers by asking them if they were fathers, and commenting that a father − Corporal Dickson − would not be going home, the Commonwealth relies on the United Supreme Court's decision in *Oregon v. Bradshaw*, 462 U.S. 1039 (1983), and this Court's decision in *Commonwealth v. Hubble*, 504 A.2d 168 (Pa. 1986) (plurality). *See* Commonwealth's Brief at 34-35. In *Bradshaw*, the police were investigating the death of

a minor found in a wrecked vehicle. The defendant was taken to the police station for questioning and given his *Miranda* warnings. He admitted to providing the deceased with alcohol, but denied involvement in the traffic accident. He was placed under arrest and re-read his *Miranda* rights. When an officer subsequently suggested that the defendant was involved in the accident, the defendant denied his involvement and stated: "I do want an attorney before it goes very much further." 462 U.S. at 1041-42. The officer immediately terminated the conversation. Later, as the defendant was being transferred to the county jail, he asked a police officer what would happen to him. The officer reminded the defendant that he had requested an attorney, and advised him that, if he wanted to speak, it needed to be at his "own free will." *Id.* at 1042. The defendant said that he understood, and the officer suggested the defendant could help himself by taking a polygraph examination. The defendant took the test the following day, first signing a written waiver of his *Miranda* rights. When the examiner told the defendant he believed the defendant was not telling the truth, the defendant recanted his earlier story and admitted to being the driver of the vehicle at the time of the accident.

On appeal from his conviction of, *inter alia*, first-degree manslaughter, the defendant argued that his statement was obtained in violation of his Fifth Amendment rights. The high Court determined there was no violation of the *Edwards* rule because the defendant's question to the police officer as to what would happen to him "was not merely a necessary inquiry arising out of the incidents of the custodial relationship," but "could reasonably have been interpreted by the officer as relating generally to the investigation. That the police officer so understood is apparent from the fact that he immediately reminded the accused that 'you do not have to talk to me,' and only after the accused told him that he 'understood' did they have a generalized conversation." *Id.* at 1046.

In *Hubble*, the accused was interviewed by police on several occasions regarding a triple homicide. During one such occasion, Hubble and his wife voluntarily accompanied police to the police station and Hubble signed a written waiver form and agreed to give a tape-recorded statement. His wife suggested he should first get a lawyer, and Hubble then stated that he wanted a lawyer. Hubble asked for permission to call Jack Felix, an attorney. A detective looked up the attorney's telephone number and permitted Hubble to dial the number. Upon learning Felix was not available, Hubble asked to call his probation officer. Hubble told his probation officer that he was being questioned and wanted an attorney, and asked whether the Public Defender's office would represent him. The probation officer told Hubble he was not sure whether the Public Defender would represent him because he had not yet been arrested, but suggested that he call the Public Defender's office. After ending the phone call with his probation officer, Hubble spoke for a short time with his wife, and again agreed to give a taped statement. The taped statement was not self-incriminating, but incriminated his brother. As the accused and his wife were leaving the police station, they asked to speak to each other privately. After doing so, the accused gave a second taped statement, this time incriminating himself. The following day, the accused telephoned the police and told them that everything he had said the previous day was a lie. However, upon returning to the police station, the accused admitted that his confession had been truthful and reiterated the same.

Prior to trial, the accused sought suppression of his statements, but the trial court denied his motion, and he was convicted of, *inter alia*, three counts of second-degree murder. On appeal, the Superior Court reversed, holding the accused "clearly and unequivocally invoked his right to counsel and after he had attempted, unsuccessfully, to reach counsel by telephone, he was questioned further" by the police. *Commonwealth v.*

*Hubble*, 464 A.2d 1236, 1243 (Pa. Super. 1983). The Superior Court determined that the fact that Hubble responded to police-initiated questioning after he was unable to reach an attorney did not establish a waiver of the right to counsel previously invoked, as it was not Hubble that initiated the further conversation. The Commonwealth appealed, and this Court reversed in a fractured opinion. Several Justices concluded that Hubble had not unambiguously invoked his right to counsel, and several further concluded that, even if Hubble had invoked his right to counsel, he subsequently waived that right by "initiat[ing] the events which lead [sic] to his inculpatory statement, since the prior interview had ended and appellee and Mrs. Hubble were in the process of leaving the barracks *when [Hubble] requested to stay* and talk with his wife privately." *Commonwealth v. Hubble*, 504 A.2d 168, 174 (Pa. 1986) (emphasis original).

We reject the Commonwealth's suggestion that Appellant's question to Corporal Clark and Trooper Mulvey as to whether the officers were fathers, and Appellant's subsequent observation that "[t]here was a father that didn't come home," amounted to an initiation of further conversation with police as contemplated by *Edwards*. First, we note that, unlike *Bradshaw* and *Hubble*, in the instant case, there was *no break* in questioning once Appellant stated that he did not want to talk about the crimes, or, indeed, at any time during the interview. Rather, Corporal Clark and Trooper Mulvey continued their questioning of Appellant for more than three hours, simply redirecting the subject of the conversation whenever Appellant indicated that he did not want to talk about his crimes or stated that he did not want to provide the police with additional information without first speaking with a lawyer. Without a stop or a break in conversation, we fail to see how there could be a subsequent *reinitiation* of conversation. Further, unlike the officer in *Bradshaw*, Corporal Clark and Trooper Mulvey did not remind Appellant that he had a right not to speak.

Moreover, even if we were to agree with the Commonwealth's assertion that Appellant's question regarding whether the officers were both fathers and Appellant's comment that there was a father that "didn't come home" could be interpreted as an initiation of further conversation, the Commonwealth fails to address the fact that *immediately after* making the two statements, Appellant again told the officers that he did not "want to get too far into it," because he would be going to trial, thereby reiterating his desire not to speak with the officers about the crime. Notwithstanding this reiteration by Appellant that he did not want to discuss the crime, the officers continued to question Appellant, as detailed above, and eventually, Appellant stated that he did not want to provide the officers with "*too much info until I talk to a lawyer.*" *Id.* at 1:25 minutes. However, the officers continued to question Appellant.

Based on our review of the videotaped interview, which clearly demonstrates that Appellant unambiguously invoked his right to remain silent on multiple occasions, and that the officers continued to question Appellant notwithstanding those invocations, we conclude that the trial court erred in denying Appellant's motion to suppress the statements he made to police during his post-arrest videotaped interview.

A suppression court's error in failing to suppress statements by the accused, however, will not require reversal if the Commonwealth can establish beyond a reasonable doubt that the error was harmless. *Com. v. Baez*, 720 A.2d 711, 720 (Pa. 1998). *Miranda* violations are subject to this harmless error rule. *Commonwealth v. Diaz*, 264 A.2d 592, 594 (Pa. 1970) (*Miranda* violations "do not call for automatic reversal," but are subject to the harmless error rule). Indeed, in the case *sub judice*, the Commonwealth argues that any error by the trial court in failing to suppress Appellant's statements was harmless.

Harmless error exists if the Commonwealth proves that (1) the error did not prejudice the defendant or the prejudice was *de minimis*; (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict. *Commonwealth v. Burno*, 154 A.3d 764, 787 (Pa. 2017).

In the instant case, we have no hesitation in concluding that the trial court's error in refusing to suppress the statements made by Appellant in his post-arrest videotaped interview was harmless because the properly admitted and uncontradicted evidence of guilt was so overwhelming, and the prejudicial effect of the admission of Appellant's videotaped interview so insignificant by comparison, that its admission could not have contributed to the verdict. As recounted above, it was established at trial that the bullets that killed Corporal Dickson and wounded Trooper Douglass were fired from a Norinco rifle which belonged to Appellant, and which was later recovered from the airplane hangar where Appellant had been hiding following the shooting. Appellant himself directed the U.S. marshals to the location of the rifle at the time he was captured, and Appellant's DNA was on the rifle. The evidence also revealed that Appellant had conducted internet searches for possible targets, including the Blooming Grove police barracks, and response procedures for when officers are shot, in the days leading up to the shootings. Finally, in the days following the shootings, police located a white trash bag at a campsite, and the trash bag contained an empty water bottle with Appellant's DNA, and three pages torn from a small spiral notebook which specifically described the shootings of Corporal Dickson and Trooper Douglass. A handwriting expert testified that the pages bore Appellant's handwriting, and an expert in document authentication testified that the pages

appeared to come from a notebook found in the airplane hangar, which itself detailed Appellant's actions as a fugitive over a period of six weeks following the shootings.

In light of the substantial physical evidence establishing Appellant as the perpetrator of these crimes, we conclude that the trial court's error in denying Appellant's motion to suppress the statements he made in his videotaped interview was harmless, and, thus, that Appellant is not entitled to relief.[22]

As noted above, Appellant also maintains that the trial court committed an error of law and abused its discretion in refusing to suppress his statements to police during the videotaped interview because he was denied his right to counsel under the Fifth and Sixth Amendments to the United States Constitution, and was denied due process under the Fourteenth Amendment to the United States Constitution and Article 1, § 9 of the Pennsylvania Constitution. Specifically, Appellant avers that, at approximately 8:48 p.m., less than 15 minutes after the officers began their interview of Appellant, James Swetz, Esquire, began telephoning the Pennsylvania State Police to advise them he had been retained by the Frein family to "advise [Appellant] on his constitutional rights and wished to speak with [Appellant.]." Appellant's Brief at 24. Appellant contends that the failure of the police to inform him that Attorney Swetz was "present, willing and available" deprived him of his right to counsel. *Id.* Appellant further asserts that, in light of Attorney Swetz's familiar and distinguished reputation in the region, it is obvious that Appellant would have "at the very least, wanted to briefly consult with Attorney Swetz before continuing the interrogation if he were only informed that the attorney was present and available." *Id.* at 30-31.

---

[22] Indeed, in his closing argument, the prosecutor made a single reference to Appellant's post-arrest videotaped interview, noting simply that Appellant "state[d] the obvious" about the recovered Jeep, the campsite, and his involvement. N.T. Trial, 4/19/17, at 55.

We need not determine whether the trial court erred in refusing to suppress the statements Appellant made during the videotaped interview on the ground that Appellant was denied his right to counsel, as we have already determined that the trial court erred in failing to suppress those same statements because the police failed to honor Appellant's invocation of his right to remain silent. Moreover, as we have explained above, however, any error by the trial court in refusing to suppress Appellant's statement was harmless in light of the overwhelming, properly admitted, evidence establishing Appellant's guilt.

### III. Challenge to Trial Court's Admission of Victim Impact Evidence

Appellant next contends that the trial court erred in allowing the Commonwealth to introduce at the penalty phase of his trial victim impact evidence that "began [as] traditional impact [evidence], but . . . crossed the line and developed into emotionally charged, cumulative, and much more prejudicial than probative" testimony. Appellant's Brief at 39. Appellant argues that the evidence admitted by the trial court in the instant case was so "overpowering, emotional [and] highly prejudicial" that its admission violated his due process rights under the Fourteenth Amendment, and his Eighth Amendment right against cruel and unusual punishment. *Id.* at 42.

The Pennsylvania Sentencing Code permits the introduction of two types of victim impact evidence during the penalty phase of a capital trial: (1) evidence about the victim; and (2) evidence regarding the impact that the death of the victim has had on the victim's family. 42 Pa.C.S. § 9711(a)(2); *Commonwealth v. Bryant*, 67 A.3d 716, 726 (Pa. 2013); *see also Commonwealth v. Flor*, 998 A.3d 606, 634 (Pa. 2010) ("[t]estimony that is a personal account describing the devastating impact the murders had on the surviving families is wholly appropriate and admissible at the sentencing phase of a capital case.").

The admission of victim impact evidence, like all evidence, is within the sound discretion of the trial court, "which must balance evidentiary value against the potential dangers of unfairly prejudicing the accused, inflaming the passions of the jury, or confusing the jury." *Bryant*, 67 A.3d at 726. This Court will reverse a trial court's decision regarding the admissibility of evidence only when the appellant sustains the "heavy burden" of establishing that the trial court has abused its discretion. *Id.* An abuse of discretion "will not be found based on a mere error of judgment, but rather exists where the court has reached a conclusion which overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will." *Commonwealth v. Eichinger*, 915 A.2d 1121, 1140 (Pa. 2007).

The Commonwealth's first penalty phase witness in the instant case was Tiffany Dickson, Corporal Dickson's widow. During the course of her testimony, the trial court admitted, without objection from defense counsel, a series of photographs (Exhibits 537 through 545). The photographs depicted Corporal Dickson in his Marine uniform, and Tiffany Dickson in uniform as a nursing student; Corporal Dickson at his graduation from the crime law justice program at Penn State; Tiffany Dickson at her graduation from nursing school; Corporal and Tiffany Dickson on their wedding day; Corporal and Tiffany Dickson on their honeymoon in Disney World; Corporal Dickson with his nephew; and Corporal Dickson following his graduation from the Pennsylvania State Police Academy. N.T. Trial, 4/20/17, at 73-75.

Thereafter, the Commonwealth sought to introduce a photograph of Corporal and Tiffany Dickson and their first son at the beach, at which point defense counsel objected on the ground that the evidence "has now gone far beyond victim impact." *Id.* at 76. The trial court overruled the objection, noting that, based on the evidence that had already been presented, it appeared there was a "chronological nature of what's being

presented." *Id.* at 77. The court explained that, while it would not limit the number of photos introduced by the Commonwealth, the proffered photos should not be repetitive. *Id.* The trial court further advised that it intended to give each party "as much latitude as I can," and it advised the Commonwealth that it could proceed. *Id.* at 79. At this time, defense counsel stated, "Your Honor, as for the admission of these photos, I'm going to say I have no objection based on the Court's ruling." *Id.* The Commonwealth then introduced Exhibits 546 through 553, which depicted Corporal and Tiffany Dickson after the birth of their second son;[23] Corporal Dickson and his first son holding Corporal

---

[23] Prior to the admission of the photographs, the prosecutor asked Tiffany Dickson to tell the jury about the birth of her second child, which she described as follows:

> Adam was due September 2008, but he was late. He was delivered in October 2008 and when I was pushing and pushing and everything was okay and then at five centimeters the cord prolapsed cut-off and started to bleed out, so we had to push the cord back up. Bryon was with me and I just said, "Oh, I'll be okay and I was going to the OR," and then we went to the OR and when they pulled me over from the cart to the table, the epidural pulled out, they didn't know that, so they started -- they gave me a local anesthetic and they started to cut and I felt everything.
>
> So, then they said, "No, let's just sedate her," so they sedated me with some Diprivan and then intubated me to keep my airway open and then pulled him out at 5:15 he was born and at 10 o'clock I woke up and I saw the baby next to me and I said, "Oh my gosh thank gosh he made it and I said, we have to breast feed him, that's very important to latch immediately so that baby could get all the nutrients from the mom."
>
> The nurse goes, "Your husband breast fed him already. I said, "What? How he can't (sic) breastfeed him? He can't breast feed him." And she said, "No, you were sedated, we propped you up and he held the baby, he had him latch, so that was good."

N.T. Trial, at 67-68.

Justice Wecht opines that the above description was "impactful and powerful," "unduly prejudicial," "striking and graphic," and designed "only to inflame the passions of those called upon to decide between life and death." Concurring and Dissenting Opinion (Wecht, J.) at 20. Though vivid, Tiffany Dickson's three-paragraph description of the birth of her son, in our view, was neither graphic, nor offered for the sole purpose of inflaming the passions of the jury. Rather, it was consistent with the type of thorough recollection of childbirth offered by many women when asked. Moreover, the testimony was presumptively offered, as Justice Wecht concedes, *see id.* at 19, to demonstrate that Corporal Dickson was a committed and caring father.

Dickson's second son; Corporal Dickson with both of his sons "showing them how to play patty cake;" Corporal and Tiffany Dickson's sons in their homemade Halloween costumes; Corporal Dickson with his sons at the beach; Tiffany Dickson with her sons; Corporal Dickson teaching his first son how to use a fishing rod; and Corporal Dickson and his sons putting together a play set. *Id.* at 80-81.

The Commonwealth additionally sought the admission of photographs designated Exhibits 554 through 563, at which time defense counsel noted his "continuing objection based on [his] previous argument." *Id.* at 82. The trial court noted, but overruled, the objection, and the Commonwealth was permitted to introduce the photographs which depicted Corporal Dickson and his wife and sons after the ceremony at which he became Corporal; Corporal Dickson with two fellow troopers; Corporal Dickson with his second son during a vacation cruise; Corporal Dickson and his first son on that same cruise; Corporal Dickson's two sons on the cruise; Corporal Dickson's two sons dressed in their father's police hat and boots; Corporal and Tiffany Dickson at Christmas; Corporal Dickson with his brother and sister at Christmas; and Corporal and Tiffany Dickson and their sons at a family gathering on a large farm. *Id.* at 82-84. The Commonwealth also introduced photographs (Exhibits 564 through 566) of Tiffany Dickson and her first son in front of Corporal Dickson's casket; Tiffany Dickson in front of the casket; and Tiffany Dickson and her two children, with Corporal Dickson's uniform, taken on Mother's Day 2015. *Id.* at 96-97.

Finally, Tiffany Dickson testified that, following the death of Corporal Dickson, their first son, age 7 when his father was killed, developed behavioral problems which included difficulty sleeping, bedwetting, self-biting, night terrors, anger issues, bullying at school, and expressing that he wanted to die. *Id.* at 91-92. He required medication and developed neurological problems. *Id.* at 91. Tiffany Dickson further stated that their

second son, age 5 at the time of the shooting, is defiant and failing school. *Id.* at 93. She also testified that, since her husband's death, she feels sad, lonely, without support or protection, and that she has no identity other than as the widow of a slain officer. *Id.* at 95-97.

The Commonwealth then sought to introduce portions of a video from Corporal Dickson's graduation from the Pennsylvania State Police Academy. The portions of the video that were shown to the jury, which totaled approximately 15 minutes, included a speech by then Allegheny County Deputy District Attorney Mark Tranquilli; Corporal Dickson taking his oath of office; Corporal Dickson receiving his badge; and the State Police Call of Honor. *Id.* at 106-107. Defense counsel objected to the introduction of this evidence on the basis that it was cumulative of the numerous photographs previously introduced and was unduly prejudicial. *Id.* at 104-06. The trial court overruled the defense objection and admitted the videotape, reiterating that it was "going to try to give each side as much latitude as possible to present [its] case," and stating that it "view[ed] what's being presented in the category of the victim, victim impact." *Id.* at 108. The trial court indicated, however, that it would give the jury an appropriate instruction as to how to treat victim impact testimony.

Finally, the Commonwealth presented testimony from several of Corporal Dickson's colleagues, who testified regarding Corporal Dickson's strengths as a police officer, as well as the testimony of Corporal Dickson's sister, Stacy Hinkley; his father, Bryon Dickson; and his mother, Darla Dickson. During the testimony of Darla Dickson, the Commonwealth introduced a video of Corporal Dickson and his youngest son.

Without question, the victim impact evidence admitted by the trial court in the instant case was extensive, arguably unnecessarily so. Moreover, some of the evidence described above was not victim impact evidence at all. For example, as Justice Wecht

observes, the substance of Attorney Tranquilli's speech, in which he challenged the new troopers to emulate the work ethic and bravery of Pennsylvania State Police Corporal Joseph Pokorny, who was fatally shot in 2005, did not concern Corporal Dickson personally, nor did it pertain to the impact Corporal Dickson's death had on his family.

Nevertheless, we are constrained to agree with the Commonwealth that, because the jury found several aggravating circumstances, but no mitigating factors, Appellant has failed to establish that he was prejudiced by the admission of the above-described testimony. In this regard, subsection 9711(c)(2) provides: "The court shall instruct the jury that if it finds at least one aggravating circumstance and at least one mitigating circumstance, it shall consider, in weighing the aggravating and mitigating circumstances, any evidence presented about the victim and about the impact of the murder on the victim's family."

Indeed, in accordance with subsection 9711(c)(2), the trial court instructed the jury as follows:

> In deciding whether aggravating or mitigating circumstances exist and whether aggravating outweigh mitigating circumstances, you should consider the evidence and arguments offered by both the Commonwealth and the Defendant. This includes the evidence that you heard during the earlier trial to the extent that it bears upon the issues now before you. You have heard evidence about the victim, Bryon K. Dickson, II and about the impact of the victim's murder upon his family. I'm talking about the testimony presented by Tiffany Dickson, Sergeant Michael Walsh, Lieutenant Sean Jennings, Concetta Uckele, Retired Major John Dockerty, Sergeant Derek Fellsman, Stacy Hinkley, Bryan Dickson, and Darla Dickson.
>
> This evidence is subject to two special rules. First, you cannot regard it as an aggravating circumstance. Second, *if you find at least one aggravating circumstance and at least one mitigating circumstance, you may then consider the victim and family impact evidence when deciding whether aggravating outweigh mitigating circumstances.* Each of you

may give the victim and family impact evidence whatever weight, favorable or unfavorable to the Defendant, that you think it deserves. Your consideration of this evidence, however, must be limited to a rational inquiry into the culpability of the Defendant, not an emotional response to the evidence presented.

N.T. Trial, 4/26/17, at 162-63 (emphasis added).

A jury is presumed to follow the trial court's instructions on the law. *Commonwealth v. Harris*, 817 A.2d 103, 1053 (Pa. 2002). Herein, the trial judge instructed the jury that it could not consider the victim impact testimony unless it found at least one aggravating circumstance and at least one mitigating circumstance. The jury did not find any mitigating circumstances, and, therefore, it must be presumed that the jury did not consider the Commonwealth's victim impact testimony in rendering its verdict. As such, we hold that Appellant has failed to establish a basis for relief. *See id.* (rejecting the appellant's challenge to the trial court's admission of victim impact testimony, *inter alia*, on the basis that the jury did not find any of the proffered mitigating circumstances, and, thus, failed to demonstrate prejudice).

Notwithstanding the above, Appellant maintains that the victim impact evidence admitted by the trial court in the instant case "was so overwhelming that it amounted to an additional super aggravating circumstance," and was so "overpowering, emotional [and] highly prejudicial," that its admission violated his due process rights under the Fourteenth Amendment, and his Eighth Amendment right against cruel and unusual punishment. Appellant's Brief at 42. This Court addressed a similar argument in *Commonwealth v. Ballard*, 80 A.3d 380 (Pa. 2013), wherein the appellant alleged that the quantity and tenor of the victim impact testimony admitted at his trial violated his right to due process and his right to be free from cruel and unusual punishment under both the Pennsylvania and U.S. Constitutions. Ballard pled guilty to four counts of first-degree murder, and, following a penalty phase hearing, the jury returned a sentence of death on

each of the counts. On Count 1, the jury found two aggravators and one mitigator (extreme mental or emotional disturbance); on Count 2, the jury found one aggravator and no mitigators; and on Counts 3 and 4, the jury found two aggravators and no mitigators.

Like Appellant herein, Ballard argued, *inter alia*, that victim impact testimony can "become[] its own *de facto* aggravating factor," particularly because juries are not provided proper guidance as to how to consider such testimony against the statutory aggravating and mitigating factors. *Id.* at 403. In rejecting Ballard's constitutional arguments, we first observed that, in *Payne v. Tennessee,* 501 U.S. 808 (1991), the United States Supreme Court declared that "a State may properly conclude that, for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant," especially given the state's interest in rebutting a defendant's mitigation evidence. *Id.* at 825. In *Payne*, the high Court overruled its prior decision in *Booth v. Maryland*, 482 U.S. 496 (1987), which prohibited the introduction of victim impact testimony at a capital sentencing hearing on the ground that such testimony was irrelevant to the proceedings and created "a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner." *Id.* at 502-03.

We further noted in *Ballard* that, subsequent to *Payne*, and beginning with our decision in *Commonwealth v. Means,* 773 A.2d 143 (Pa. 2001) (Opinion Announcing Judgment of Court ("OAJC")), this Court has ruled that victim impact testimony admitted under Section 9711(a)(2) is constitutional. *See Means,* 773 A.2d at 154; *see also id.* at 159 (Saylor, J., concurring) (agreeing with conclusion in OAJC that amendment to death penalty statute allowing victim impact testimony is constitutional). The OAJC in *Means* stated:

[V]ictim impact testimony is just one of the relevant factors the jury may consider when weighing the aggravating and mitigating circumstances it has found during its deliberations on sentence. The addition of victim impact testimony into the deliberative process is not such an arbitrary factor that its inclusion would preclude meaningful appellate review. We are satisfied that the trial judges of this Commonwealth can adequately prevent unduly prejudicial and inflammatory information from entering into the jury's deliberations in the guise of victim impact testimony.

*Id.* at 154.

Finally, we held in *Ballard* that the appellant's claims failed, as they involved "a full panoply of arguments we have considered and rejected in prior decisions," 80 A.3d at 404, including *Means*, 773 A.2d at 154 (rejecting argument that jury is not given proper direction in how to weigh victim impact testimony); *Eichinger,* 915 A.2d at 1139 (rejecting argument that victim impact testimony amounts to impermissible "non-statutory" aggravating factor); and *Commonwealth v. Williams,* 854 A.2d 440, 446 (Pa. 2004) (rejecting arguments that testimony unconstitutionally focused jury on victim's life and amounted to "super aggravating factor"); *see also Harris*, 817 A.2d at 1053 (rejecting the appellant's argument that the admission of victim impact testimony is "violative of the due process, equal protection, and cruel and unusual punishment clauses" of the Pennsylvania and Federal Constitutions). Accordingly, we reject Appellant's claim that the trial court's admission of the victim impact evidence in the instant case violated his constitutional rights under the Eighth and Fourteenth Amendments.[24]

---

[24] In his concurring and dissenting opinion, Justice Wecht credits Appellant's argument in part, concluding that the victim impact evidence "was so emotionally overpowering, and so extensive, that it necessarily inhibited the ability of this jury to fairly assess this case." Concurring and Dissenting Opinion (Wecht, J.) at 20. While we believe that reasonable minds could disagree about the emotional weight of some of the challenged evidence, we cannot agree that, in the context of *this* case, the challenged evidence overpowered the

## IV. Challenge to Trial Court's Jury Instruction on Mitigation

In his final briefed issue, Appellant asserts that the trial court abused its discretion in denying his request for the following jury instruction:

> To establish a mitigating circumstance to which you should consider and give effect, the Defendant need not establish a nexus between the mitigating circumstance and the crime. In other words, the mitigating circumstance need not be a defense or an excuse for the crime. *Tennard v. Dretke*, 542 U.S. 274, 286 (2004).

Appellant's Brief at 43. In *Tennard*, the high Court explained that a Texas capital sentencing scheme which required a nexus between a defendant's proffered mitigation evidence and the alleged crime was unconstitutional, and that a defendant is entitled to have the jury consider evidence which might serve as a basis for a sentence less than death. 542 U.S. at 285-87.

This Court reviews penalty-phase jury instructions in the same manner in which it reviews challenges to jury charges given during the guilt phase of trial; specifically, we consider the charge in its entirety, rather than discrete portions of the instruction. *Eichinger*, 915 A.2d at 1138. In addition, trial courts are free to use their own expressions, so long as the concepts at issue are clearly and accurately presented to the jury. *Id.*

Preliminarily, and as the Commonwealth observes, the constitutionality of Pennsylvania's capital sentencing scheme, in contrast to the Texas sentencing scheme

---

jury's ability to determine if a death sentence was warranted. The instant case involved the meticulously-planned and premeditated murder and attempted murder of two police officers, for which the evidence of Appellant's guilt was pervasive and largely unchallenged. The jury was presented with proof of five aggravating factors, including the death of a police officer. While Justice Wecht opines that "it is impossible not to conclude that the victim impact evidence took on the predominant evidentiary role for the Commonwealth", *id.* at 21, we conclude that, despite the victim impact evidence presented, the predominant evidentiary consideration in this case was the murder and attempted murder of two police officers.

at issue in *Tennard*, has been upheld by the United States Supreme Court. Indeed, in *Blystone v. Pennsylvania*, the high Court stated:

> We think that the Pennsylvania death penalty statute satisfies the requirement that a capital sentencing jury be allowed to consider and give effect to all relevant mitigating evidence. Section 9711 does not limit the types of mitigating evidence which may be considered, and subsection (e) provides a jury with a nonexclusive list of mitigating factors which may be taken into account − including a "catchall" category providing for the consideration of "[a]ny other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense." *See* 42 Pa.Cons.Stat. § 9711(e)(8) (1988).

494 U.S. 299, 305 (1990).

The trial court in the instant case described for the jury 29 specific "matters," which, "if proven to [the jury's] satisfaction by a preponderance of the evidence can be mitigating circumstances." N.T. Trial, 4/26/17, at 159-62.[25] The trial court further instructed the jury:

---

[25] The "matters" were described by the trial court as follows:
1. [Appellant] has no history of violent infractions at the Pike County Correctional Facility;
2. Eugene Michael Frein had a prior problem with alcoholism;
3. [Appellant] was raised by a verbally abusive Father;
4. [Appellant] had a learning disability during his childhood;
5. [Appellant] could not read on his own until the 6th grade;
6. [Appellant] stuttered as a child;
7. [Appellant] was isolated from extended family members;
8. The parents of [Appellant] had marital problems during the time he lived in their home;
9. Eugene Michael Frein taught and discussed firearms with [Appellant];
10. Eugene Michael Frein discussed anti-government and anti-police views with [Appellant];
11. [Appellant] was proud of and looked up to his Father;
12. Debbie Frein was more concerned with her appearance than her children;
13. [Appellant] played video games;

In making the decision whether or not to impose the death penalty upon Eric Frein it is entirely proper for you to consider sympathy or mercy as a reason to impose a life sentence subject to the following instructions.

This sympathy or mercy which you may wish to show Eric Frein must be founded upon any item or items of evidence any one or more of you find to be a mitigating circumstance. That is worth repeating. The sympathy or mercy which you may wish to show Eric Frein must be founded upon evidence any one or more of you find to be a mitigating circumstance.

---

14. Eugene Michael Frein discussed survival tactics with [Appellant];
15. Eugene Michael Frein was the owner of the sniper handbook located in [Appellant's] bedroom;
16. Eugene Michael Frein lied about his military service to [Appellant] and family members;
17. [Appellant] encouraged Warren Ahner to pursue his career interests;
18. [Appellant] loves his brother's children Addison and Timothy;
19. [Appellant] expressed remorse for his offenses and concern for the victim's family;
20. [Appellant] told the state police where an additional rifle could be located;
21. [Appellant] apologized to his own family in the video interview;
22. [Appellant] surrendered to the U.S. Marshalls without incident;
23. [Appellant] cooperated with the state police during the video interview;
24. [Appellant] worked at Camp Minci at the Firearm Instruction Station;
25. [Appellant] completed 92 college credits;
26. [Appellant] made Tiffany Frein feel like someone loved her;
27. [Appellant] was Tiffany Frein's protector;
28. There was little effective communication in the Frein household;
29. Any other evidence of mitigation concerning the character, background, and record of [Appellant] and circumstances of his offense.

N.T. Trial, 4/26/17, at 160-62.

*Id.* at 163.

Nevertheless, noting that, of the 29 mitigating circumstances proffered by the defense in his case, only two − Number 9 (Appellant's father taught and discussed firearms with him) and Number 10 (Appellant's father discussed anti-government and anti-police views with him) − "may have explained or could have implied a reason for causing" his commission of the crime, Appellant contends that the requested instruction was necessary "to temper an argument from the prosecution that [Appellant's] love for his parents and family has no connection to the offense." Appellant's Brief at 44-45. Appellant suggests that "at least one, and perhaps more than one [mitigating circumstance], would have been found if the mitigation instruction had been given." *Id.* at 46.

Initially, we note that Appellant does not support this particular claim with any citation to the record, and we are unable to locate any place in the record that corroborates Appellant's characterization of the Commonwealth's argument. Regardless, however, this Court has previously explained that *Tennard*:

> hold[s] evidence relevant to a defendant's character must be admitted in a capital sentencing if a defendant offers it. In no way [does the] case[] say the jury is required to give it any weight, or that the Commonwealth is not permitted to argue against it or produce contrary evidence. It is well settled "[a] prosecutor may rebut mitigation evidence in his arguments and may urge the jury to view such evidence with disfavor."

*Commonwealth v. Eichinger*, 108 A.3d 821, 838-39 (Pa. 2014).

The trial court's instructions in the instant case were consistent with the high Court's decisions in *Tennard* and *Blystone*, as well as this Court's decision in *Eichinger*. Accordingly, we hold that Appellant is not entitled to relief.

### V. Statutory Review of Death Sentence

As a final matter, although Appellant does not raise the issue in his brief, this Court is required to conduct an independent review to determine (1) whether the sentence of death was the product of passion, prejudice, or any other arbitrary factor; or (2) if the evidence fails to support the finding of at least one aggravating circumstance listed in 42 Pa.C.S. § 9711(d). *See* 42 Pa.C.S. § 9711(h)(3) (requiring affirmance of the sentence of death unless this Court concludes either of these two factors are present); *Ballard*, 80 A.3d at 409-10.

Following a thorough review of the entire record in this case, we hold that Appellant's sentences of death were not the product of passion, prejudice, or any other arbitrary factor, but, rather, were supported by the overwhelming evidence that Appellant fatally shot Corporal Dickson, a law enforcement officer, with malice and the specific intent to kill. Moreover, the Commonwealth proved the following aggravating factors beyond a reasonable doubt: (1) the victim was a police officer killed in the performance of his duty, 42 Pa.C.S. § 9711(d)(1); (2) the offense was committed during the perpetration of a felony, *id.* § 9711(d)(6);[26] (3) Appellant knowingly creating a grave risk of danger to other persons, including Trooper Douglass and Nicole Palmer, *id.* § 9711(d)(7); and (4) Appellant had been convicted of another state offense at the time of the offense at issue for which a sentence of life imprisonment or death was imposable, *id.* § 9711(d)(10). As the jury found no mitigating circumstances, Appellant's sentences comply with the statutory mandate for the imposition of a sentence of death where one or more aggravating circumstances and no mitigating circumstances are found. *See id.* § 9711(c)(1)(iv). Accordingly, there are no grounds upon which to vacate Appellant's

---

[26] The felony offenses included criminal attempt to commit first-degree murder; criminal attempt to commit murder of a law enforcement officer; assault of a law enforcement officer; terrorism; weapons of mass destruction; and discharge of a firearm into an occupied structure.

sentences pursuant to 42 Pa.C.S. § 9711(h)(3), and, for all of the above reasons, we affirm Appellant's convictions and sentences of death.

Chief Justice Saylor and Justices Baer, Dougherty and Mundy join the opinion.

Justice Donohue files a concurring opinion.

Justice Wecht files a concurring and dissenting opinion.