J-A15028-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| ZACHARIAS DEJENE | : | |
| | : | |
| Appellant | : | No. 662 WDA 2022 |

Appeal from the PCRA Order Entered May 6, 2022
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0013874-2018

BEFORE: MURRAY, J., McLAUGHLIN, J., and COLINS, J.[*]

MEMORANDUM BY McLAUGHLIN, J.: **FILED: DECEMBER 6, 2023**

Zacharias Dejene appeals the denial of his request for relief under the Post-Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546. He maintains the court erred in denying his PCRA petition that raised several claims of ineffective assistance of counsel. We affirm.

A jury found Dejene guilty of rape, sexual assault, and indecent assault.[1] On the day of the assault, the victim and Dejene were at a weekend retreat sponsored by a private organization associated with their university. The PCRA court aptly summarized the victim's testimony as follows:

> At some point during the evening, [the victim] went upstairs where her bedroom was located and shortly after [Dejene] also went upstairs. [The victim] testified that when she approached her bedroom [Dejene] was right behind her and

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 3121(a)(1), 3124.1, and 3126(a)(1), respectively.

told her that he had claimed that bedroom. She then returned to the first floor to see if someone would change rooms with her. This was confirmed by the testimony of Mr. [Phillip] Wang and Mr. [Douglas] Qian. When no one offered to change rooms [the victim] returned to get her belongings. While she gathered her things [Dejene] entered the room. He suggested they share the room and then closed the bedroom door. [The victim] responded that sharing a room would be inappropriate. [The victim], who was dressed in jeans, a turtleneck, and undergarments, testified that [Dejene] began grabbing at her clothes. [The victim] pushed him away and repeatedly told him "No" and to stop. [Dejene] then pushed [the victim] onto the bed and removed her jeans and underwear and demanded that she remove her turtleneck. [Dejene] straddled her with his penis exposed, whereafter [the victim] asked him to wear a condom fearing that penetration would occur. He ignored her and responded by yelling, "I'm going to fuck the shit out of you." [Dejene] fell off the bed and [the victim] ran to the door only to be blocked by [Dejene]. Thereafter, [Dejene] pushed [the victim] back onto the bed and engaged in vaginal intercourse with her while repeating, "I'm going to [] fuck the shit out of you." [The victim] testified that she was unsure if [Dejene] ejaculated during the intercourse. Upon hearing footsteps in the hallway, [the victim] leapt off the bed towards the door. [Dejene] again attempted to block her from leaving but [the victim] managed to exit.

PCRA Findings and Order of Court ("PCRA Op."), filed 5/6/22, at 3-4 (footnotes omitted).

When the victim returned to campus the next day, she went to the health services center, and they recommended that she go to a hospital. At the hospital, the victim received a rape kit examination by Amanda Pampena, a Sex Assault Nurse Examiner ("SANE"). N.T., Trial, September 24-27, 2019, at 198. Part of the examination included oral, vaginal, and cervical swabs. Pampena testified at Dejene's trial that she did not observe any injuries to the

victim's vaginal area but explained at trial that the absence of injury does not mean that the victim's vaginal area had not been penetrated. ***See id.*** at 209.

The Commonwealth presented the testimony of an expert in forensic biology, Elizabeth Wisbon. She testified that the initial screenings of the vaginal swap from the rape kit detected male DNA. ***Id.*** at 347, 348, 351. Further processing "resulted in no male DNA detected at quantitation." ***Id.*** at 351. Wisbon testified that Dejene was "excluded as the contributor" of the DNA recovered from the victim's underwear. ***Id.*** at 353. She testified however that "[t]he absence of male DNA does not mean that a sexual assault did not take place." ***Id.*** at 354.

During cross-examination, Wisbon conceded that depending on the circumstances, the absence of DNA could mean that no penial penetration occurred. ***Id.*** at 357. The court then proceeded to question Wisbon. Relevant to this appeal, the court inquired as follows:

> The Court: All right. And so if, for example - - and if you didn't - - okay, so I think the jury is clear on what the results were. But my question is - - my last question is really when these swabs are taken from - - these are intimate samples, correct?
>
> [Wisbon]: Correct.
>
> The Court: What do you mean by intimate samples?
>
> [Wisbon]: An intimate sample, such as the vaginal vault swabs or the oral swabs are considered intimate when they are taken directly from a person's body. We call them intimate because we know they're taken from their body and we expect that the individual who had their body parts swabbed, their DNA would also be present on that swab

because if you were to swab my mouth, you're going to collect some of my cheek cells.

The Court: So if you have an intimate sample like a vaginal sample or the example you have of your [sic] inside of your mouth, if there is also male skin cells on those samples, how do the ratios of the amount of DNA compare versus an intimate person's DNA amount versus a non intimate person's skin samples.

[Wisbon]: With skin samples, there is less DNA present on those samples than there would be if you were to swab an individual's mouth or another orifice. The reason for that is your mouth is constantly generating cells. It heals very quickly. So when you swab a mouth, you gather hundreds upon hundreds of swabs [sic]. Whereas, the cellular material on your hands, because they are a little more rough and designed to be a little more resilient, they don't shed as much skin cells. So not as much DNA is present if I were to handle an object versus if I were to spit on an object. There's a lot more DNA and cells in my mouth that would be in the spit than if I were to touch it.

The Court: All right. So if you - - all right. So let's say I was choking on a piece of food and you stuck your finger inside my throat to help me and you got the food out, and then somebody swabbed the inside of my mouth, whose DNA is more likely to show up on a swab?

[Wisbon]: It would be your - - the DNA from Your Honor's mouth.

The Court: Now, does that mean that there's none of your DNA in my mouth?

[Wisbon]: It does not mean that. There could be very small amounts, but because there is so much of your own DNA in your mouth, it kind of overshadows it. If you think of two - - I'll use this paper and this tissue. So this is the DNA from my finger, which I used to help Your Honor stop from choking. This is the DNA from Your Honor's mouth. So when I put the two together, you can no longer see the DNA from my finger because there is so much DNA from Your Honor's mouth. It doesn't mean that my DNA isn't there. It's just difficult to obtain with our testing because there's so much

more of the mouth that was swabbed. The same would be true for other mucous membranes.

The Court: All right. So applying it to this case, if I'm hearing you correct, confirm or deny this, so with regards to this whole situation of like a penis, for example, and a vagina, it could be that there was no penetration at all by a penis of a vagina, right?

[Wisbon]: Yes.

The Court: Or it could be that there was, but the penis skin cells are so overshadowed by the multitude of vaginal skin cells.

[Wisbon]: Correct.

The Court: I understand.

*Id.* at 363-367. When defense counsel asked if she agreed that "absolutely no DNA that belongs to Zacharias Dejene was recovered according to this report," Wisbon responded, "For all of the samples that were interpretable, yes." *Id.* at 367-368.

Dejene took the stand in his own defense. He testified that he had consensual oral sex with the victim. *Id.* at 421. Trial counsel also presented four character witnesses. Each testified that Dejene had a reputation in the community for having a good moral character and being trustworthy. *Id.* at 469, 473, 476, 479.

During jury instructions, the court explained to the jury that the Commonwealth bore the burden of proving Dejene's guilt beyond a reasonable doubt. *See id.* at 528-529. It said that a reasonable doubt included "a doubt that would cause a reasonably careful and sensible person to pause or hesitate before acting in a matter of importance in his or her own affairs"; "must fairly

- 5 -

arise out of the evidence that was presented or out of the lack of evidence presented with respect to some element of the crimes charged"; and "must be a real doubt." *Id.* at 529. The court then gave its own illustration of reasonable doubt.

> Now, what I just read to you is the textbook definition of beyond a reasonable doubt, and it is read in every courtroom in this courthouse pretty much the same way, but like most textbook definitions, it leaves a little bit to be desired.
>
> So it is my practice to give you a common[]sensical hypothetical situation from every[]day life that might help you to understand what we mean when we say beyond a reasonable doubt so that you know the level of certainty that's required in a criminal case.
>
> So this is the hypothetical situation that I'm going to throw at you.
>
> Let's say that it is, I don't know, let's say that it's Tuesday morning, just a few days ago, all right, and let's say your alarm clock goes off and you wake up in the morning, jump out of bed and you say, Hot damn, today is the day I get to go downtown to serve jury duty.
>
> So you go over to the closet and you pull out the outfit that you had planned to wear the night before because you want to look your best, and lo and behold, you notice when you pull out the shirt for the outfit there's a big crease right across the front of the shirt. You must have put too many clean clothes in too small of a closet.
>
> So what do you do? Well, you're not thinking very clearly. You go downstairs real quick. You get yourself a cup of some kind of caffeine. You feed the pets, and you come back upstairs, and by this time, you decide I haven't had my morning caffeine yet, it hasn't kicked in, it's too late for me to try to figure out a whole new outfit. So I'm just going to put up the ironing board real quick and plug in the iron so I can iron that shirt real quick.

So that's what you do. You put up the ironing board, plug in the iron and you go to take your shower while that's heating up. You get out of the shower, you towel yourself off, you come out, you put your under-things on, and you go over to the ironing board, the iron is nice and hot, you put the shirt down, and real quick you just press off the wrinkle out of that shirt. But before you get dressed, you decide, [w]ell, I'm going to brush my teeth before I put this nice recently ironed shirt on because I don't want to slop toothpaste all over it.

So you go in the bathroom, you brush your teeth, you do your hair, you come back out, and you get dressed in that freshly pressed shirt and the rest of your clothes. All right?

You then go to the top of the steps, you head downstairs, you pour yourself one more to-go cup of caffeine, you say good-bye to the pets, and you get in your car, you pull out of your driveway, you drive to the end of your street.

You stop for the stop sign, because you are a law-abiding citizen, and you put on your turn signal getting ready to make your turn to head downtown.

As you are sitting at that stop sign, however, a thought flashes across your mind. You say to yourself, Wait a minute. Did I remember to pull the plug on that iron, because nobody is going to be home before me. The only ones in the house are going to be those pets, and if they start chasing each other around the house, they could knock over the ironing board, and that iron is right next to my bedroom curtains. It could catch the curtains on fire. I could come home to a smoldering ruin.

So what do you do? Well, at that point, do you immediately screech your tries, pull a U-turn and go racing back to your house to check on that iron? No, you don't do that. Why? Because you don't have to. Because you have evidence that you have to go over. You have evidence you have to review.

So while you sit there at the stop sign in your mind's eye, you review the evidence of what you did that morning. You remember the alarm clock getting you up. You remember getting up. You remember going over to the closet. You remember opening the closet. You remember getting the shirt out. You remember that you went downstairs. You got

your coffee. You fed those pesky pets. You came back upstairs. You set up the ironing board. You plugged in the iron, and then while it was heating up, you remember you went and took your shower. You got out of the shower and you came out and you remember you put your underclothes on. You came over and you picked up the iron and you used the iron and you pressed off that shirt. You remember you went back in, brushed your teeth, came back out, you put on that shirt and then the rest of your clothes, and then you went over to the top of the steps to head downstairs and get yourself another - - wait a minute. In reviewing the evidence, you remember that at one point after you got dressed, you were trying to put your wristwatch on and you accidentally dropped your wristwatch on the carpeted floor of your bedroom, and you remember that when you bend over to get your wristwatch, you were at eye level with the outlet and you pulled the plug out of the wall.

So did you have a doubt as you sat there at the stop sign as to whether you unplugged the iron? Well, of course you had a doubt, because there are few decisions that any of us make in life without some degree of doubt. The question is not merely did you have doubt? The question is was it a reasonable doubt? And I would submit to you that doubt was never a reasonable doubt, because you were able to resolve the doubt by examining the evidence. All right?

So that is an example of the kind of level of certainty that we talk about when we talk about beyond a reasonable doubt, and I used an example from every[]day life because I think it's something that everybody can understand.

So I hope that that helps you to understand a little better what we're talking about when we're talking about beyond a reasonable doubt. All right?

To summarize, you may not find the defendant guilty based on the mere suspicion of guilt. The Commonwealth has the burden of proving the defendant guilty beyond a reasonable doubt. If it meets that burden, then the defendant is no longer presumed to be innocent and you should find him guilty.

On the other hand, if the Commonwealth does not meet its burden, then you must find the defendant not guilty.

*Id.* at 530-536.

The court also instructed the jury on consent. After reading the standard charge on consent, the court stated the following:

> Now the burden is on the Commonwealth to prove beyond a reasonable doubt that the alleged victim did not give a legally effective consent.
>
> Thus, you cannot convict the defendant unless you are satisfied beyond a reasonable doubt that [the victim] did not give a legally effective consent.
>
> In other words, it's the defendant's job to set up the defense. It is the Commonwealth's job to knock it down like a bowling pin.

*Id.* at 574-575.

The jury returned a guilty verdict for the above-referenced offenses and the court sentenced Dejene to four to eight years' incarceration for rape followed by four years of reporting probation and a consecutive term of one year of reporting probation for sexual assault. *See* Order of Sentence, filed 12/19/19. Dejene did not file a direct appeal.

Dejene filed a counseled PCRA petition in June 2020, raising multiple ineffectiveness claims, among other claims. The PCRA court granted an evidentiary hearing limited to the following ineffectiveness claims:

- Failing to demand that the Commonwealth provide an expert opinion regarding DNA evidence prior to trial;

- Failing to consult with or call a DNA expert;

- Failing to object to the trial court's biased and inappropriate questions regarding DNA;

- Failing to handle the DNA evidence effectively affected [Dejene's] decision to testify;

- 9 -

- Failing to object to the trial court's inappropriate diminishing of the reasonable doubt instruction; and

- Failing to object to the trial court's inappropriate burden shifting during jury instruction.

Memorandum of Law in Support of Zacharias Dejene ("PCRA Memo.") filed 6/9/20 at 22-43, 69-75; Order of Court, filed 1/29/21. Although Dejene had proffered the testimony of three DNA experts, the order scheduling the evidentiary hearing limited Dejene to calling one of the experts, without determining which of the three should testify. *See* Order of Court, filed 1/29/21.

At the evidentiary hearing, Dejene presented the testimony of Dr. Theodore Kessis, an expert in the field of molecular biology and forensic DNA analysis. He also presented trial counsel, Matthew Ness, Esquire; Dejene's father; and Dejene. The Commonwealth countered with testimony from its trial expert, Elizabeth Wisbon. Following the hearing, the court denied Dejene's PCRA petition, and this timely appeal followed.

Dejene raises the following issues:

1. Whether trial counsel was ineffective for failing to object to the erroneous jury instructions and examples given by the trial court with respect to the definition of reasonable doubt and the burden of proof which had the effect of both lowering the constitutionally required burden of proof and shifting it to the defense?

2. Whether trial counsel was ineffective in his handling of the DNA evidence insofar as:

   a. Trial counsel did not demand nor seek an order demanding that the Commonwealth produce reports summarizing the opinions of its DNA experts;

- 10 -

      b. Trial counsel did not retain a DNA and/or Sexual Assault Nurse Examine (SANE) expert to assist counsel in handling the DNA and SANE evidence and to offer evidence to rebut misleading impressions/evidence offered by the Commonwealth and the trial court regarding penetration and the evidentiary value of the presence/absence of DNA;

      c. Trial counsel failed to object to the trial judge's biased questioning of the Commonwealth's DNA expert;

      d. Because of trial counsel's failure to hire the appropriate expert/experts, he was unable to effectively assist Mr. Dejene with his decision to testify?

3. Whether trial counsel was ineffective for failing to elicit relevant character traits when offering evidence of Mr. Dejene's good character?

4. Whether trial counsel was ineffective in failing to seek a missing evidence jury instruction with regard to the alleged torn turtleneck and the missing text messages from the complaining witness' text message chain in order to assist the jury in according the appropriate weight to the Commonwealth's evidence?

5. Whether trial counsel was ineffective insofar as not requesting a mistake of fact jury instruction from the [c]ourt?

6. Whether the cumulative errors warrant a new trial?

7. Whether the PCRA Court erred by limiting Mr. Dejene's PCRA presentation of expert testimony to one (1) expert witness and thereafter entering an order dismissing the PCRA on the grounds that counsel failed to carry the burden of production?

Dejene's Br. at 11-12.

When reviewing the denial of PCRA relief, we determine whether the

PCRA court's determinations "[are] supported by the evidence of record and

[are] free of legal error." **Commonwealth v. Midgley**, 289 A.3d 1111, 1118 (Pa.Super. 2023) (citation omitted). We will not disturb the PCRA court's factual findings unless the certified record does not support them. **See id.** We review its legal conclusions *de novo*. **See Commonwealth v. Spotz**, 18 A.3d 244, 259 (Pa. 2011).

## INEFFECTIVE ASSISTANCE OF COUNSEL

Dejene's first five issues address the alleged ineffective assistance of counsel. We presume counsel to be effective.

> To establish ineffectiveness, a petitioner must plead and prove the underlying claim has arguable merit, counsel's actions lacked any reasonable basis, and counsel's actions prejudiced the petitioner. Counsel's actions will not be found to have lacked a reasonable basis unless the petitioner establishes that an alternative not chosen by counsel offered a potential for success substantially greater than the course actually pursued. Prejudice means that, absent counsel's conduct, there is a reasonable probability the outcome of the proceedings would have been different.

**Commonwealth v. Brown**, 48 A.3d 1275, 1277 (Pa.Super. 2012) (citation omitted).

*Jury Instruction – Reasonable Doubt and Consent Defense*

Dejene argues that counsel was ineffective for failing to object to the trial court's reasonable doubt instruction. Dejene maintains that the court's instruction "was confusing, erroneous and lessened the Commonwealth's burden proof." Dejene's Br. at 24. He alleges "[t]he [c]ourt reduced reasonable doubt into a memory test." **Id.** Dejene argues that the court's example "conflated the concept of weighing of evidence" with retracing one's

steps. *Id.* He further argues that the court's analogy placed the burden on the members of the jury to rely on their knowledge rather than the evidence. By telling the jurors that the standard reasonable doubt explanation was "like most textbook definitions, it leaves a little bit to be desired," the court "direct[ed] the jurors to disregard the standard instruction in exchange for his 'real world' example." *Id.* at 26.

In Dejene's view, the court's hypothetical improperly suggested that mere hesitation alone – in the court's example, hesitating at the stop sign – was sufficient to raise reasonable doubt. He maintains that in this regard the hypothetical was in conflict with the standard instruction, which states that "the facts cause a reasonable person to hesitate in a matter of importance, reasonable doubt exits." *Id.* at 29.

He also argues that counsel erred in failing to object to the court's explanation of the Commonwealth's burden to prove a lack of consent. He maintains that the court improperly shifted the burden of proof when it stated, "In other words, it's the defendant's job to set up the defense. It is the Commonwealth's job to knock it down like a bowling pin." *Id.* at 30 (quoting N.T. at 574-575).

In his witness letter to PCRA counsel, Attorney Ness explained that he had "observed [Judge Tranquilli] to have used a version of [the reasonable doubt] example in prior trials" and in some of those occurrences "juries have still returned verdicts of 'not guilty.'" Amended PCRA Petition, filed 5/7/21, Exhibit 25, p. 4. Because of this, counsel concluded that "objecting to the

example would not 'un-ring the bell.'" ***Id.*** Regarding the court's statement about consent, counsel concluded that "given the primary instruction was read to the jury, objecting to [it] would not 'un-ring the bell.'" ***Id.***

Here, the PCRA court found that both claims lacked arguable merit. The court determined that "[i]t is apparent from the record, that the trial court significantly follow[ed] the [Pennsylvania Suggested Standard Criminal Jury Instruction] on reasonable doubt and accurately defined the concept for the jury." PCRA Op. at 33. It further concluded that the court gave its reasonable doubt hypothetical after providing "the standard instruction, which not only provided context for the example but reiterated the Commonwealth's burden." ***Id.*** Regarding the court's statement about the Commonwealth's burden to prove a lack of consent, the PCRA court determined that "[t]he instruction accurately reflected the Commonwealth's burden to prove beyond a reasonable doubt that the victim did not give consent." ***Id.*** at 35.

We agree that the underlying objection to the reasonable doubt instruction lacked arguable merit. We do not examine various parts of jury instructions in isolation. Rather, we review the whole charge in its entirety. ***See Commonwealth v. Frein***, 206 A.3d 1049, 1077 (Pa. 2019). Trial courts are "free to use their own expressions, so long as the concepts at issue are clearly and accurately presented to the jury." ***Id.*** "There is error in jury instructions only when the trial court abuses its discretion and inaccurately states the law." ***Commonwealth v. Kane***, 188 A.3d 1217, 1231 (Pa.Super. 2018).

Here, the court gave the jury its reasonable doubt hypothetical only after giving the standard jury instruction for reasonable doubt. The instruction thus as a whole gave a correct statement of reasonable doubt. The court was free to use its "own expressions." Moreover, we perceive no prejudice from counsel's failure to object to the reasonable doubt instruction. Dejene's complaint is that the hypothetical suggested that the jury could find reasonable doubt if it hesitated while recalling the evidence, rather than if "the facts [would] cause a reasonable person to hesitate in a matter of importance[.]" Dejene's Br. at 29. In our view, the difference inured to Dejene's benefit because if anything, the hypothetical suggested a lower hurdle for finding reasonable doubt.

As for the instruction on consent, we do not think Dejene has shown prejudice. Dejene testified that the interaction with the victim was consensual. In that context, the court correctly informed the jury that the burden was "on the Commonwealth to prove beyond a reasonable doubt that the alleged victim did not give legally effective consent." N.T. Trial at 574. The court then attempted to restate the instruction succinctly, saying, "In other words, it's the defendant's job to set up the defense. It is the Commonwealth's job to knock it down like a bowling pin." *Id.* at 574-575. Even assuming that an objection to the statement that "it's defendant's job to set up the defense" would have had arguable merit, Dejene cannot show that that statement caused him prejudice because he testified that the victim consented. Dejene

failed to carry his burden of showing that if counsel had objected, the outcome of the proceeding would probably have been different.

*DNA Testimony*

Dejene raises numerous claims of counsel's ineffectiveness regarding the DNA testimony at trial. First, he claims that counsel "failed to seek opinions of the Commonwealth's expert [Elizabeth Wisbon] prior to trial and was thus unprepared when those opinions were given." Dejene's Br. at 37. These opinions included Wisbon's testimony that the "absence of male DNA does not mean that a sexual assault did not take place" and that "the uninterpretable DNA from the exterior crotch panel of the underwear was because not enough DNA was obtained from that particular sample." *Id.* at 39, 40 (citing N.T., Trial at 354, 358) (internal quotations omitted). Dejene contends that these opinions were "unfair and improper." *Id.* at 39. He maintains that if counsel had inquired about Wisbon's report before trial, he could have hired an expert witness to rebut the testimony. Dejene argues that even though there was no evidence of his DNA, Wisbon's opinions left "the jury with the impression that his DNA was actually present." *Id.* at 41.

The PCRA court rejected Dejene's claim. It noted that counsel testified that he had conversations with the lab technician regarding the DNA results before trial. *See* PCRA Op. at 19. It also found that counsel effectively cross-examined Wisbon about her testimony that a lack of DNA was not evidence that a sexual assault did not occur. The court determined that counsel "elicited testimony from Ms. Wisbon that depending on the variables, a lack of male

DNA could also be consistent with no penile penetration, which was consistent with the defense theory." *Id.* at 19-20. (footnote omitted).

The PCRA court's conclusions are supported by the record and free of legal error. Although counsel may not have known that Wisbon would testify that the lack of DNA was not indicative that a sexual assault did not occur, counsel testified that in his experience "it would not be unusual for a lab technician from the Allegheny County Crime Lab to testify that theoretically, anything was possible." N.T. PCRA Hearing, 5/25/21, at 94. Additionally, counsel testified that before trial, he had a 45-minute phone conversation with a crime lab technician, reviewing the lab test results. *See id.* at 107, 108. Thus, the evidence presented at the PCRA hearing evidenced that counsel was not unprepared as Dejene suggests.

Dejene also claims that "counsel failed to object to biased questioning by the trial judge," referencing the court's finger-and-mouth analogy. *See* Dejene's Br. at 42. The PCRA court rejected this claim, finding that the court instructed the jury "both in the opening and closing charge . . . that any questions asked by the court do not reflect [its] opinion regarding the evidence and that no significance should be attached to them in comparison to other questions asked of a witness." PCRA Op. at 26 (citing N.T. Trial at 38, 584).

This claim is meritless. The trial court instructed the jury of its responsibility to consider the evidence for itself. It also advised the jury that the court's questions were not a reflection of its "opinion about the evidence

or about the case," and that the jury should not interpret the court's actions as "trying to lead [the jury] to render a particular verdict."

> Understand it's the answers that are the evidence, not the questions.
>
> I may question some of the witnesses myself. Now, my questions will not reflect and are not designed to reflect my opinion about the evidence or about the case.
>
> My only purpose will be to ask about matters which, in my opinion, need to be more fully explored or explained for your benefit.
>
> ***
>
> Now, I have not attempted to indicate my opinion concerning the weight which you should give to the evidence or any part of it, and I do not want you to think that I have.
>
> If during the course of the trial I asked any questions of a witness, which I did, you are not to attach any[]more or less significance to those questions and answers than to any other questions and answers.
>
> If during the trial I exhibited what you felt to be annoyance or displeasure toward any witness or lawyer or if I made any comments or displayed any facial expression, you are not to assume that I am trying to lead you to render a particular verdict because I am not.

N.T., Trial at 38, 584-585.

We presume the jury followed the court's instructions. As such, we perceive no prejudice to Dejene. **_See Commonwealth v. Naranjo_**, 53 A.3d 66, 71 (Pa.Super. 2012). The PCRA court properly rejected this claim.

Dejene next alleges that counsel erred by failing to hire a "DNA/SANE expert." Dejene's Br. at 47. The PCRA court determined that counsel had a strategic basis for not calling such a witness. It stated that counsel explained

that he reviewed Wisbon's report and that "he planned to call [Wisbon] if the Commonwealth chose not to because he determined that their expert supported the defense theory." PCRA Op. at 22 (footnote omitted).

Dejene fails to show prejudice. As the PCRA court pointed out, counsel thoroughly cross-examined Wisbon. Counsel obtained Wisbon's admission on cross-examination that it was also possible that the absence of DNA meant that "there was no penetration[,]" which was consistent with Dejene's testimony that he only performed oral sex on the victim. N.T. Trial at 357. Moreover, Dr. Kessis testified that based on the facts of the case, he "would expect to see DNA," and indeed the DNA evidence at trial did not implicate Dejene. N.T. PCRA Hearing at 71. Thus, calling a DNA expert to testify that they would have expected to find Dejene's DNA if penetration had occurred would have been cumulative. Dejene thus has not shown that failing to present the testimony of such an expert prejudiced him.

Dejene's final ineffectiveness claim regarding the DNA evidence is that counsel "was unable to effectively assist Mr. Dejene with his decision to testify" since he did not hire a DNA expert. Dejene's Br. at 55. He maintains that if he had known that there were DNA experts who could testify as to their opinion that DNA should have been recovered, he would not have testified.

The PCRA court noted that counsel testified that he advised Dejene to testify since there was no DNA evidence linking him to the assault. The court determined that even considering the expert testimony at the PCRA hearing, "there is nothing of record to support [Dejene's] assertion that a DNA expert

would have been able to provide testimony that would 'directly contradict' [the victim's] testimony." PCRA Op. at 28. The court also stated that expert testimony would not have been "a direct contradiction of the victim's statement, as it was clear from both experts that a lack of DNA does not preclude the conclusion that a sexual assault occurred." *Id.*

"The decision of whether or not to testify on one's own behalf is ultimately to be made by the defendant after full consultation with counsel." ***Commonwealth v. Nieves***, 746 A.2d 1102, 1104 (Pa. 2000). A defendant making such a claim must show that: 1) "counsel interfered with his right to testify" or 2) "counsel gave specific advice so unreasonable as to vitiate a knowing and intelligent decision to testify on his own behalf." ***Id.***

Here, Dejene failed to meet his burden. There is no evidence that counsel interfered with his right to testify or that counsel gave him unreasonable advice. Counsel's advice that a lack of DNA evidence paired with Dejene's testimony would be to his benefit was not "so unreasonable as to vitiate a knowing and intelligent decision to testify[.]" ***See id.*** There is nothing in the record suggesting Dejene did not make a knowing, intelligent, and voluntary decision to testify. The court committed no error in rejecting this claim.

### *Character Evidence*

Dejene argues that counsel erred by "failing to elicit pertinent character traits" that tended to exculpate Dejene. He maintains that if counsel had presented testimony of Dejene's character traits "for being peaceful, non-

violent and law-abiding[,]" the testimony could have created a reasonable doubt. Dejene's Br. at 62, 64. Dejene also alleges that counsel erred by failing to elicit testimony of his reputation for being truthful and honest.

"Failure to present available character witnesses may constitute ineffective assistance of counsel." *Commonwealth v. Harris*, 785 A.2d 998, 1000 (Pa.Super. 2001). A defendant may introduce evidence of his or her character traits that are relevant to a crime charged. *See* Pa.R.E. 404(a). In a rape case, admissible evidence of the defendant's relevant character traits may include evidence of traits such as "non-violence or peaceableness, quietness, good moral character, chastity, and disposition to observe good order." *Commonwealth v. Radecki*, 180 A.3d 441, 454 (Pa.Super. 2018) (citation omitted). "[I]n a case where there are only two direct witnesses involved, credibility of the witnesses is of paramount importance, and character evidence is critical to the jury's determination of credibility." *Harris*, 785 A.2d at 1000.

Evidence of a defendant's character for truthfulness is admissible where it is relevant to an element of the crimes charged or where the Commonwealth has attacked the defendant's reputation for truthfulness. *See Commonwealth v. Fulton*, 830 A.2d 567, 572 (Pa. 2003). Furthermore, "evidence of good character . . . may be considered by the jury in connection with all of the evidence presented in the case on the general issue of guilt or innocence." *Commonwealth v. Luther*, 463 A.2d 1073, 1077 (Pa.Super. 1983). The jury "is free to believe all, part or none of the evidence."

***Commonwealth v. Teems***, 74 A.3d 142, 145 (Pa.Super. 2013) (citation omitted).

Here, the Commonwealth charged Dejene with rape, sexual assault, and indecent assault. None of these crimes have an element for which truthfulness would have been relevant. ***See*** 18 Pa.C.S.A. §§ 3121(a)(1), 3124.1, and 3126(a)(1). Nor did the Commonwealth attack Dejene's reputation for truthfulness at trial. Dejene's claim insofar as it relates to counsel's failure to inquire about Dejene's reputation for truthfulness has no merit.

Regarding character evidence of his alleged trait of non-violence, Dejene claimed below that "counsel was clearly aware of the availability of character witnesses who would have testified to Mr. Dejene's character for being peaceful, non-violent and law abiding." PCRA Memo. at 47. He maintained that counsel had no reasonable basis for failing to present such testimony. Dejene also attached an exhibit four letters from the same four defense witnesses called during his trial. ***See id.*** at Exhibit 12. Each affidavit provides that the witness would have testified to Dejene's nonviolent character trait had they been asked by counsel.

This claim of ineffectiveness has arguable merit. Since Dejene was charged with crimes of violence, namely rape and sexual assault, evidence of his character for being a non-violent person was relevant and admissible. ***See Radecki***, 180 A.3d at 454. However, Dejene fails to show prejudice. The jury heard testimony from four witnesses that Dejene possessed good moral character. This was "substantive" evidence and "an independent factor which

- 22 -

may of itself [have] engender[ed] reasonable doubt or produce[d] a conclusion of innocence." **Luther**, 463 A.2d at 1077. Although not identical, there is some overlap between good moral character and a propensity for non-violence. In view of the significant testimony that he possessed good moral character, the absence of the additional character testimony does not undermine confidence in the verdict. Dejene has not shown a reasonable probability that but for counsel's error, the outcome of the trial would have been different.

*Missing Evidence Jury Instruction*

Dejene alleges that counsel should have asked for a missing evidence instruction for two pieces of "evidence": text messages from the victim's phone and the victim's turtleneck worn on the night of the assault. Regarding the text messages, Dejene claims that the messages introduced at trial were "not complete and sections of the conversations were removed." Dejene's Br. at 71. He contends that the text messages were material because they "include[d] the complainant's words, thoughts and feelings immediately after the alleged incident[.]" *Id.* at 72. As for the turtleneck, Dejene maintains that it was material evidence because it was relevant to the victim's testimony that she noticed that her turtleneck was ripped when she went to the hospital and that it was not ripped before the sexual assault. **See** N.T., Trial, at 117. Dejene argues that by failing to request a missing evidence instruction, counsel forfeited the reasonable probability of an acquittal. He alleges that absent the instruction, "there is a reasonable likelihood" that the jury gave weight to the

victim's testimony that Dejene ripped her turtleneck and that she texted about the assault shortly after it occurred. *Id.* at 73-74.

To succeed on a claim of ineffectiveness for failure to request a jury instruction, a petitioner must prove he was entitled to the instruction based on the evidence presented at trial. *See Commonwealth v. Spotz*, 18 A.3d 244, 299-300 (Pa. 2011). Pennsylvania Suggested Standard Criminal Jury Instruction 3.21B regarding missing evidence provides that:

> If three factors are present, and there is no satisfactory explanation for a party's failure to produce an item, the jury is allowed to draw a common-sense inference that the item would have been evidence unfavorable to that party. The three necessary factors are:
>
> *First*, that the item is available to that party and not to the other;
>
> *Second*, that it appears the item contains or shows special information material to the issue; and
>
> *Third*, that the item would not be merely cumulative evidence.

Pa.SSJI (Crim) § 3.21B (emphasis in original).

Here, Dejene was not entitled to a missing evidence instruction. Dejene claims that "chains [of the text messages] are not complete and sections of the conversations were removed." Dejene's Br. at 71. He directs us to one portion of the victim's testimony regarding the text messages in support of his argument that the victim did not explain why there were "incomplete text chains[.]" *Id.* at 72. He notes that she testified "I believe the first message [of the second screenshot] was probably responding to something else, but

then the second message, I went back and I said, 'oh my god, I can't.'" ***Id.*** (alteration in original) (citing N.T., 9/25/19, at 128). However, a review of the context of the victim's testimony reveals that the Commonwealth did not ask the victim and she never agreed that there were messages missing.

> Q [The Commonwealth]: This is the first page of Commonwealth Exhibit No. 3. What message do you say there? What is that?
>
> A [the victim]: So at 2:30, I started messaging. I said, "Oh, my God guys, I'm at this retreat thing and Zack Dejene is also here and he fucking just forced himself on me."
>
> Q: And I will move it up higher so you can get a better look. What else is there?
>
> A: I said, "It was so fucking disgusting."
>
> Q: That's page 1 of that 3. This would be page 2 of 3. Does the message continue?
>
> A: I believe the first message was probably responding to something else, but then the second message, I went back and I said, "Oh I can't. So we're at this Airbnb, and I took a room, and he just set his stuff in my room and fucking refused to leave. So I said, Okay, I'll take a different room."

N.T., Trial at 128-129. Furthermore, Dejene does not explain what part of the messages were "tactically and intentionally photographed to cut certain parts of the conversation out." Dejene's Br. at 72. Thus, he fails to show that any of the messages were missing and as such a missing evidence instruction would not have been proper. Counsel committed no error.

As for the turtleneck, there is no evidence that it was in the Commonwealth's or the victim's possession at the time of trial. Additionally, the victim's turtleneck did not show "special information material" to the case.

The SANE nurse testified on cross examination that if she had noticed something about the victim's clothing, she would have "photographed and advised to turn it in" but that in this case, she did not take any photographs of any torn clothing. **See** N.T., Trial, at 214. Thus, the testimony of the SANE nurse provided relevant evidence of the victim's claim and an instruction regarding its absence would have been cumulative. Counsel was not ineffective for failing to ask for the instruction and the PCRA court committed no error.

*Mistake of Fact Jury Instruction*

Dejene argues that counsel should have requested a mistake of fact jury instruction. Dejene states that while the current law of this Commonwealth does not recognize mistake of fact as a defense to rape, this Court should find that counsel should have asked for the instruction.

This claim is meritless. Mistake of fact was not a defense to the crimes charged. Counsel did not err by not requesting such a jury instruction. **See Commonwealth v. Williams**, 439 A.2d 765, 769 (Pa.Super. 1982) (holding that the defendant's belief as to the victim's state of mind is not a defense as to the crime of rape). Counsel cannot be found ineffective for failing to raise a meritless claim. **See Commonwealth v. Spotz**, 896 A.2d 1191, 1210 (Pa. 2006).

**ADMISSION OF EVIDENCE**

Dejene claims that the court erred by limiting the number of experts he could present at the PCRA hearing. Although he acknowledges that it is within

a court's discretion to limit the admission of evidence, Dejene maintains that by doing so here, the court prevented him from meeting his burden.

The PCRA court determined that two expert witnesses were not necessary for purposes of the evidentiary hearing because the testimony of both witnesses would have been "cumulative and not corroborative" of the testimony of the witness who did testify. Statement In Lieu of Opinion, filed 7/21/22, at 4. It concluded that both witnesses were experts in the field of DNA testing and analysis and that both would testify that:

1. Contrary to the Commonwealth's assertions and the judge's misleading questioning based upon [the victim's] version of the events they would have expected to have DNA present in the swabs[;]

2. DNA would likely not have been swamped out and undetectable[;]

3. Trial counsel was ineffective for failing to hire such expert witnesses[.]

*Id.* at 3 (quoting PCRA Memo. at 30).

The admissibility of evidence is within the discretion of the court. ***Commonwealth v. Hoover***, 107 A.3d 723, 729 (Pa. 2014). "Evidence is admissible if, and only if, it is relevant." ***Commonwealth v. Weaver***, 768 A.2d 331, 332 (Pa.Super. 2001). The court may exclude relevant evidence where its probative value is outweighed by "needlessly presenting cumulative evidence." Pa.R.E. 403. Additionally, an abuse of discretion occurs where the court's decision is the "result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly

erroneous." ***Hoover***, 107 A.3d at 729 (citation omitted). It also occurs when the court has overridden or misapplied the law. ***See id.***

Dejene's claim is meritless. Although the court permitted Dejene only to call Dr. Kessis, the testimony of the additional proposed expert witnesses was cumulative to Dr. Kessis's testimony. ***See Commonwealth v. G.D.M., Sr.***, 926 A.2d 984, 989 (Pa.Super. 2007); PCRA Memo at 34 (stating Dr. Kessis and Mehul B. Anjaria, both experts in DNA testing, "agree that a rape, as described by [the victim], would have certainly resulted in the deposition of a detectable amount of Mr. Dejene's DNA"); PCRA Memo at 35 (stating both experts "would testify that, according to science, the rape as described by [the victim] did not occur"); PCRA Memo at 34 n. 31 (stating another expert, Dr. Suzanne Rotolo, completed a report that read "I would expect DNA to be present"). Thus, the court did not prevent Dejene from satisfying his burden of pleading and proving his right to relief and it did not abuse its discretion. ***See*** 42 Pa.C.S.A. § 9543(a) (petitioner bears the burden of pleading and proving right to PCRA relief).

## CUMULATIVE ERROR

Dejene argues that the "cumulative errors here warrant reversal" of the PCRA court's order. Dejene's Br. at 81. He notes that "[i]t is well-settled that no number of failed ineffectiveness claims may collectively warrant relief if they fail to do so individually." ***Id.*** at 79. However, "when the failure of individual claims is grounded in lack of prejudice, the cumulative prejudice from those individual claims may properly be assessed." ***Id.*** at 80 (citing

*Commonwealth v. Koehler*, 36 A.3d 121, 161 (Pa. 2012)). Thus, he claims "that the multitude of errors in this case warrant relief insofar as the cumulative prejudice suffered by Mr. Dejene." *Id.* Here, after reviewing Dejene's claims of ineffective assistance of counsel that did not prejudice him individually, we conclude that the claims in the aggregate do not prejudice him.

Order affirmed.

Judge Murray joins the memorandum.

Judge Colins files a concurring statement.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 12/6/2023